UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
S&R DEVELOPMENT ESTATES, LLC; and "JOHN
DOE" NOS. 1 THROUGH 83,

                              Plaintiffs,                16 Civ. 8043

        - against -
                                                        **COMPLAINT**

THE TOWN OF GREENBURGH, NEW YORK; THE                    **ECF CASE**
TOWN BOARD OF THE TOWN GREENBURGH; THE
COMPREHENSIVE PLAN STEERING COMMITTEE
OF THE TOWN OF GREENBURGH; THE DEPARTMENT
OF COMMUNITY DEVELOPMENT AND                            **JURY TRIAL**
CONSERVATION OF THE TOWN OF GREENBURGH;                 **DEMANDED**
THE PLANNING BOARD OF THE TOWN OF
GREENBURGH; THE ZONING BOARD OF APPEALS
OF THE TOWN OF GREENBURGH; GREENBURGH
NATURE CENTER; THE EDGEMONT UNION FREE
SCHOOL DISTRICT NO. 6; THE BOARD OF
EDUCATION OF THE EDGEMONT UNION FREE
SCHOOL DISTRICT NO. 6; SISTERS OF THE BLESSED
SACRAMENT, INC.; PAUL J. FEINER, Individually and
as Town Supervisor of The Town of Greenburgh; and
FRANCIS SHEEHAN, Individually and as Chair of the
Comprehensive Plan Steering Committee of the Town of
Greenburgh,

                              Defendants.
---------------------------------------------------------------------X

        Plaintiffs by their attorneys, Consovoy McCarthy Park PLLC and Bleakley Platt &

Schmidt, LLP, for their complaint against Defendants, hereby allege as follows:

A.    **Introduction**

        1.      This case is about the abuse of governmental power and community pressure to

block the development of affordable housing in a segregated enclave located in the

unincorporated area of the Town of Greenburgh, New York ("Town"). Defendants have been

engaging in a decade-long effort to keep select neighborhoods and their prized Edgemont

School District from having to integrate with lower income, mostly minority residents with

children who would live in affordable housing. Defendants have conspired to prevent increased enrollment by children of mixed racial and economic backgrounds in the Edgemont School District and have sought instead to perpetuate the existing patterns of racial segregation in the Edgemont section of the Town.

2. The Town, its officers, employees, appointed officials, elected officials, boards, and commissions have conspired with and through the Edgemont School District, an order of nuns, and a local civic association to prohibit Plaintiff S&R Development Estates, LLC ("S&R") from exercising its rights to develop affordable housing on a parcel of land that it owns. Defendants have done so by: attempting to enact a bogus moratorium on development; pressuring S&R to abandon its plans or to sell its property at below market value; illegally altering official town documents; engaging in bad-faith rezoning decisions; litigating meritless arguments and appeals; and creating numerous other pretextual roadblocks intended to delay and discourage S&R from developing the property.

3. Defendants have brazenly persisted in these efforts despite numerous orders and decisions from the New York State courts. In 2012, for example, New York Supreme Court Justice Loehr held that Defendants' attempts to block S&R's affordable housing development by changing the Town map was "not based on evidence but was arbitrary and capricious, based on community pressure and bad faith." The following year, Justice Cacace determined that Defendants' second attempt to rezone S&R's property was "a poorly veiled attempt to avoid the decision and order of this court" and again found "the actions of the respondents to be arbitrary and capricious and in bad faith." As a result, the court ordered the Town to approve S&R's site plan subject to reasonable conditions. Each of the Supreme Court rulings was affirmed on appeal by the Appellate Division. In spite of these and other rulings, Defendants

have continued to find new ways to obstruct S&R from exercising its right to build affordable housing on its property.

4.      By engaging in this wrongful conduct, Defendants have violated the Fair Housing Act of 1968, the Civil Rights Acts of 1866 and 1871, the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment.

5.      Defendants' conduct has damaged, and continues to damage S&R, its principals, and potential residents of their affordable housing development. Plaintiffs bring this action to enjoin Defendants from continuing their unlawful conduct and to recover actual and punitive damages and expenses for the deprivation of their rights.

**B.      Jurisdiction and Venue**

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a); 42 U.S.C. §§ 1983, 1985, and 3601, *et seq*.; and the First, Fifth, and Fourteenth Amendments to the United States Constitution.

7.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendants and the real property that is the subject of this action are located within this judicial district.

**C.      The Parties**

8.      Plaintiff S&R is a New York limited liability company with its principal office at 600 Mamaroneck Avenue in the Town of Harrison, County of Westchester, State of New York. S&R's managing members are two brothers, Stephen and Richard Troy.

9.      Plaintiffs "John Doe" Nos. 1 through 83 are unidentified persons, the names being fictitious but are intended to represent the future residents of the multi-family dwellings proposed to be constructed on S&R's property.

10.     Defendant Town is a New York municipal corporation and a political subdivision of the State of New York with its principal office at the Greenburgh Town Hall, 177 Hillside Avenue, Greenburgh, New York. The Town's legislative powers are vested in the Town Board. The Town Board has five members, including a Supervisor. The Town Council is comprised of the four members of the Town Board exclusive of the Supervisor. At all times hereinafter mentioned, the Town acted under color of law.

11.     Defendant Town Board of the Town of Greenburgh ("Town Board") is the duly elected governing legislative body of the Town and is authorized to adopt zoning regulations, comprehensive plans, and official zoning maps, and to approve special permits and site plans in connection with land-use applications. The Town Board is comprised of five elected officials: four elected Town Board Members and the Town Supervisor. The Town Board's principal office is located at the Greenburgh Town Hall. At all times hereinafter mentioned, the Town Board acted under color of law.

12.     Defendant Comprehensive Plan Steering Committee ("CPSC") was tasked with reviewing the Town's Zoning Map and all amendments related thereto since 1980 and reporting to the Town Board any recommendation of potential changes deemed warranted. The CPSC's principal office is located at the Greenburgh Town Hall. At all times hereinafter mentioned, the CPSC acted under color of law.

13.     Defendant Department of Community Development and Conservation ("DCDC") guides the Town's growth and is responsible for encouraging economic development. The DCDC oversees the Planning Division, Zoning Division, Conservation Division, and Community Development Division. The DCDC also works closely with the Town Board, Planning Board, Zoning Board of Appeals, Historic and Landmarks Preservation Board, Conservation Advisory Council, local and regional businesses, and Town residents in shaping

development policies. The DCDC's principal office is located at the Greenburgh Town Hall. At all times hereinafter mentioned, the DCDC acted under color of law.

14.    Defendant Planning Board of the Town of Greenburgh ("Planning Board") is an independent land-use board that is tasked with reviewing all proposed development projects within the Town. The Town Board appoints the seven members of the Planning Board. The Planning Board's principal office is located at the Greenburgh Town Hall. At all times hereinafter mentioned, the Planning Board acted under color of law.

15.    Defendant Zoning Board of Appeals ("ZBA") is tasked with varying or modifying the application of any of the regulations or provisions of the Zoning Ordinance relating to the use, construction, or alteration of buildings or structures or the use of land. The ZBA is vested with, among other things, the final power (subject to judicial review) to interpret and apply the Town's zoning ordinances. The Town Board appoints the seven members of the ZBA. The ZBA's principal office is located at the Greenburgh Town Hall. At all times hereinafter mentioned, the ZBA acted under color of law.

16.    Defendant Greenburgh Nature Center ("GNC") is a 33-acre nature preserve that is partially located in the Edgemont section of the Town. The GNC's principal office is located at 99 Dromore Road, Scarsdale, New York. At all times hereinafter mentioned, the GNC acted under color of law.

17.    Defendant Edgemont Union Free School District No. 6 (the "School District") is a duly created school district authorized and directed to provide elementary and secondary education for residents of Edgemont. The School District maintains its business address at 300 White Oak Lane, Scarsdale, New York. At all times hereinafter mentioned, the School District acted under color of law.

18.     Defendant Board of Education of the Edgemont School District (the "Board of Education") has the ultimate responsibility for formulation of decisions on the general policies to be adopted in the Edgemont school system. The Board of Education maintains its business address at 300 White Oak Lane, Scarsdale, New York. At all times hereinafter mentioned, the Board of Education acted under color of law.

19.     Defendant Sisters of the Blessed Sacrament, Inc. (the "Sisters") is a religious or not-for-profit corporation located in the Edgemont section of the Town. The Sisters are located at 86 Dromore Road, Scarsdale, New York, and are the owner of real property with buildings and improvements thereon located at 86 Dromore Road, Scarsdale, New York. At all times hereinafter mentioned, the Sisters acted under color of law.

20.     Defendant Paul Feiner is the Supervisor of the Town and a Member of the Town Board, and is named as a defendant in his official and individual capacities. Defendant Feiner's principal office is at the Greenburgh Town Hall and, at all times hereinafter mentioned, Defendant Feiner acted under color of law.

21.     Defendant Francis Sheehan is a Member of the Town Board, Chair of the Town's CPSC, and Chair of a so-called "Zoning Task Force" comprised of officials of the Town's building, engineering, and law departments and the DCDC. The Zoning Task Force met weekly to discuss land-use matters concerning the Town Board, the Planning Board, and the ZBA. Defendant Sheehan is named as a defendant in his official and individual capacities. Defendant Sheehan's principal office is at the Greenburgh Town Hall and, at all times hereinafter mentioned, Defendant Sheehan acted under color of law.

**D.     <u>Background</u>**

22.     The County of Westchester has a long and deplorable history of restrictive and exclusionary zoning designed to perpetuate existing patterns of segregation. Defendants here

have engaged in this same course of illegal conduct in order to prevent S&R from bringing affordable housing to the Town.

*Westchester County's History of Restrictive and Exclusionary Zoning*

23.     Westchester County, New York (the "County"), is one of the country's most affluent suburbs. It has long been engaged in exclusionary housing practices that largely prevented minorities from moving into the County's communities. Over time, the residents of the southern part of the County, including the City of Yonkers and other towns, have become integrated. Many of the wealthier municipalities in the County, however, have manipulated zoning laws to preserve the segregated racial demographics of their neighborhoods and to prevent the development of multi-family homes. These exclusionary policies have prevented low- and middle-income families from moving into the County's wealthier communities, which remain overwhelmingly white.

24.     In 1980, the NAACP brought a lawsuit against the City of Yonkers, alleging that the city's housing policies discriminated against poor black and Hispanic residents. In 1985, following a bench trial, this Court (Sand, J.) found that the city had intentionally segregated its public housing and schools on the basis of race by zoning almost all of its subsidized housing into predominantly minority areas in violation of the Fair Housing Act and the Equal Protection Clause of the Fourteenth Amendment. *See United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276 (S.D.N.Y. 1985).

25.     Although the plaintiffs won the lawsuit and the city entered into a consent decree, Yonkers fiercely resisted the court-ordered development of affordable housing for well over a decade. The city was held in contempt of court and nearly went bankrupt before finally relenting. The final settlement agreement was not signed until 2007.

26.     Similarly, in April 2006, the Anti-Discrimination Center brought suit against Westchester County under the False Claims Act for misrepresenting to the federal government, in connection with an application for federal funding, that it was complying with fair housing laws. Specifically, the complaint alleged that the County, as a recipient of funds from the Community Development Block Grant program, had misrepresented for six years that it was in compliance with the provisions of the Housing and Community Development Act, including the requirement that it affirmatively further fair housing, as set forth in 42 U.S.C. § 5304(b)(2).

27.     Judge Cote denied the County's motion to dismiss in July 2007. *See U.S. ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, New York*, 495 F. Supp. 2d 375 (S.D.N.Y. 2007). Following discovery, the court granted partial summary judgment against the County. *See* No. 06-2860, 2009 WL 455269 (S.D.N.Y. Feb. 24, 2009). The court found that the County had falsely certified that it was complying with its obligations to affirmatively further fair housing. It ruled that the County had "utterly failed to comply" with its duty to analyze race-based impediments to fair housing. The federal government intervened in the case shortly afterwards.

28.     The County settled the case on August 10, 2009 for $62.5 million and entered into a consent decree. The decree was executed by representatives of the County and the federal government, and was approved by Judge Cote. As part of the settlement, the County agreed to spend $52 million in funds to develop new affordable housing, pay $7.5 million as a relator's fee, and pay $2.5 million in attorney's fees. Specifically, the consent decree required Westchester County to build 750 units of affordable housing, 630 of which must be provided in 31 overwhelmingly white municipalities with African-American populations under 3% and Latino populations under 7%. Although those municipalities do not include the Town, it bears

noting that, according to 2010 census data, Edgemont is approximately 1.5% African-American and 4.8% Latino.

29.    Years later, the litigation continues over enforcement of the consent decree, which the County has persistently resisted. A federal monitor has overseen implementation of the consent decree, and this past July, Judge Cote ruled that the County must hire a consultant to study barriers to fair housing in communities across the County.

30.    The consent decree requires the County to ensure that its municipalities stop using exclusionary zoning practices and to conduct a study analyzing barriers to affordable housing, which the Department of Housing and Urban Development ("HUD") has thus far rejected as inadequate, and which the court has described as a "failed process."

31.    As these landmark cases show, judicial intervention and supervision is necessary to eradicate entrenched discriminatory housing practices in Westchester County's affluent white communities.

*The Town's History of Restrictive and Exclusionary Zoning*

32.    Municipal governments in the County, such as the Town, continue to perpetuate segregated housing patterns using zoning laws, discriminatory application of zoning laws, extended delays through inaction, pretextual requirements for permit applications, dilatory litigation tactics, and even defiance of court orders.

33.    This court recently found that the Town abused its authority over land-use decisions in a similar context. In 2010, Judge Robinson found that the Town, led by Supervisor Feiner, had violated the rights of Fortress Bible Church, a predominantly minority Pentecostal church, under the Religious Land Use and Institutional Persons Act of 2000, the Free Exercise Clauses of the First Amendment and New York Constitution, the Equal Protection Clauses of

the Fourteenth Amendment and New York Constitution, and Article 78 of New York's Civil Procedure Law. *See Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409 (S.D.N.Y. 2010).

34.     The court found the Town had acted in bad faith and had used the environmental review process illegitimately as a way to block the Church's proposed development. *See id*. at 449 ("The record is replete with evidence of the Town's bad faith."). The court also found that Town staff had intentionally destroyed discoverable evidence. *See id*. at 494 ("Evidence submitted at trial confirms that the Town Board … destroyed evidence and that Defendants completely disregarded discovery obligations. Testimony at trial established that Defendants both withheld from Plaintiffs and destroyed documents that would have been probative and relevant to the issues at trial.").

35.     The court ordered sweeping declaratory and injunctive relief. Among other things, the court ordered the defendants to grant certain permits, variances, and waivers; the court also enjoined the Town from unreasonably interfering with the Church's development.

36.     In 2012, the U.S. Court of Appeals for the Second Circuit affirmed the district court's decision. *See Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012). The Second Circuit took note of the Town's bad faith. *See id*. at 218 ("the Town disingenuously used SEQRA to obstruct and ultimately deny the Church's project"); *id*. at 219 ("Our conclusion that the Church was substantially burdened is bolstered by the arbitrary, capricious, and discriminatory nature of the Town's actions, taken in bad faith. The Town attempted to extort from the Church a payment in lieu of taxes, it ignored and then replaced its Planning Commissioner when he advocated on the Church's behalf, and Town staff intentionally destroyed relevant evidence.").

37.     The case settled in late 2013, with the Town agreeing to pay $6.5 million in damages for unlawfully blocking the Church's development for over a decade.

Notwithstanding this case, Feiner has been re-elected as Supervisor since the district court decision in *Fortress Bible Church* and is in his 25th year as Supervisor.

38.     Just as in *Fortress Bible Church*, two justices of the New York Supreme Court, Westchester County have already found that the Town here acted in bad faith and abused its authority by blocking the lawful development of S&R's real estate to the detriment of minorities and families with children using the pretext of neutral regulations and by subjecting S&R to endless delay.

*Exclusionary Housing in the Town of Greenburgh*

39.     The Town of Greenburgh is located in Westchester County, just north of the City of Yonkers. It is comprised of six incorporated villages (Ardsley, Dobbs Ferry, Elmsford, Hastings-on-Hudson, Irvington, and Tarrytown) as well as several unincorporated areas outside the villages. There are three unincorporated areas in the Town that are federally-recognized zones referred to as census-designated places: Fairview, Hartsdale, and Greenville (which is better known as Edgemont).

40.     There is a desperate need for affordable housing in the Town. HUD defines "Affordable" as a rental apartment affordable to a household with an income at or below 60% of the Area Median Income adjusted by family size. For example, this is $64,420 for a family of four in Westchester. There is an overwhelming demand for units that the Greenburgh Housing Authority ("GHA") administers. In 2015, the waiting list for GHA housing opened for only four hours and then closed with over 2,000 applications submitted. The current residents of GHA housing are approximately 90% African-American and 6% Hispanic, with 45% of households having children.

41.     The GHA provides 246 units of affordable housing; but no government-sponsored affordable housing is located in Edgemont. The Town Board appoints five of the seven GHA

board members, and the GHA Board continues to place low-income housing, and to undertake large scale renovations of low-income housing, exclusively in areas outside of Edgemont, such as Fairview. The Town is a sub-recipient of Community Development Block Grant funds and other federal funds to develop GHA properties. The Town has not performed the requisite studies and actions in compliance with the provisions of the Housing and Community Development Act, including the requirement that it affirmatively further fair housing.

42. In 2013, County Legislator (and former Town Clerk of Greenburgh) Alfreda Williams announced that the Town Board has purposely steered almost all of the Town's low-income housing to Fairview. She added that the result has been the "ghettoizing" of the area. Lena Anderson, Director of the White Plains/Greenburgh Branch of the NAACP, echoed that sentiment, stating that the Town's insistence that there is sufficient affordable housing strongly suggests "pandering to special interests to preserve certain neighborhoods while 'ghettoizing' others." In addition, even Thomas Bock, editor of a weblog entitled "A Better Greenburgh" and an active participant in the Town, has written about the latest proposed affordable housing re-development in Fairview and has acknowledged that Supervisor Feiner has "purposely created a specific area within the Town [*i.e.*, Fairview] that will always remain depressed by being choked with an over-abundance of those requiring assistance for the homeless, DSS, prison release re-entry, and others in distress and need. And, while we feel compassion for these people, perhaps Mr. Feiner has avoided putting them in more affluent neighborhoods as a means to control votes?"

43. Daniel Weinfeld, another active commentator and editor of a weblog entitled "Manor Woods Blog," has written about the same re-development in Fairview, stating the "goal of integration was avoided by the Town's cynical decision to take the villages off the table followed by the winking removal of Greenville/Edgemont from consideration for public

housing sites. The result became the current 271 public housing units controlled by the GHA located primarily in Fairview….” A former resident of the Fairview section has commented on the Town's segregation: “It seems that while Paul Feiner runs a popularity campaign about the upscale Villages, he is determined to use Fairview to create a separate and unequal area to raise revenue with disproportionate commercial development, low income housing, and a school system that is reflecting the strain.”

44.     The Town's discriminatory housing, as in other communities across the country, can be traced back to restrictive covenants reflecting more openly racist attitudes of the past. For example, a 1937 case litigated the validity of racist deed covenants that attached to a home in the Edgemont/Greenville section of Town and other neighborhood properties. *See Ridgway v. Cockburn*, 163 Misc. 511 (Westchester Cty. 1937) (upholding the enforcement of a covenant stating that “No part of said parcels shall ever be leased, sold, rented, conveyed or given to Negroes or any persons of the Negro race or blood, except that colored servants may be maintained on the premises”). Edgemont's demographic imbalance today thus is in part the result of an historic pattern of racially discriminatory housing policies.

45.     In addition, exclusionary zoning policies have stifled development of multi-family and affordable housing, which has a disparate impact on minorities. While the numbers of African-Americans and Hispanics have increased in other communities in Westchester and across the nation, Edgemont remains highly segregated.

46.     Today, the Town, like Westchester County, is nearly 30% African-American and Hispanic. But this aggregate figure obscures the acute economic and racial segregation within the Town. Edgemont is far less diverse than the Town overall. According to 2010 U.S. Census data, Edgemont is only 1.5% African-American and 4.8% Latino. The racial composition of the

neighboring Fairview area is almost inverted—it is approximately 73% African-American and 14% Latino, but only 11% White and 3% Asian.

47.     The student bodies of the respective communities reflect these demographic imbalances. According to "The New York State School Report Card" for 2014-2015, available on the nysed.gov website, Edgemont Junior and Senior High School was approximately 57% White, 29% Asian, 2% African-American, and 7% Hispanic. Woodlands Middle School and High School, which is just two miles away but in the Fairview area of the Town, was approximately 8% White, 9% Asian, 50% African-American, and 32% Hispanic. In other words, the combined African-American and Hispanic population of Edgemont students is less than 10%, but is over 80% at Woodlands.

**E.     The Development**

48.     S&R owns a vacant 2.26-acre parcel, situated at 1 Dromore Road (also known as 62 Dromore Road) in Edgemont (the "Property"). The Property is identified on the relevant tax map as Tax Map Volume 8, Section 31, Sheet 37B, Block 1692, Parcels 14A, 70A, 70B, and 70C.

49.     The Property, bordered exclusively by institutional and multi-family uses, is located near Central Avenue, a heavily trafficked, primarily commercial thoroughfare. The Property is adjoined on its west by the Scarsdale Woods Condominiums, a 120-unit multi-family residential complex, and lies on the south side of Dromore Road across from the GNC property on the north side of Dromore Road. The Property is adjoined on its southern boundary by the Edgemont Junior-Senior High School. The Property is adjoined on its eastern boundary by the property of the Sisters of the Blessed Sacrament.

50.     S&R acquired the Property on May 14, 2006 and is the owner in fee. The Property had been improved with one large single-family home and a swimming pool at the time of the acquisition, but has been vacant and undeveloped since late 2006.

51.     At the time of S&R's acquisition of the Property, the Official Town Zoning Map showed that it was situated in the Central Avenue Mixed Use Impact District (the "CA Zone"), which would allow development of the Property with a multi-family residential complex containing at least 82 bedrooms. According to the Town Code, this Official Zoning Map is "the final authority as to the current zoning classification of any land" in the Town. *See* Greenburgh Town Code, section 285-7(A).

52.     Since December 2008, S&R has been attempting to develop affordable housing on the Property (the "Development"). The Development was engineered and designed by professionals as a state-of-the-art building that would feature community amenities providing the residents with space for recreation and educational opportunities.

53.     Specifically, the Development is planned to be a four-story, elevatored modern apartment building containing 45 units—seven one-bedroom units and 38 two-bedroom units. The building will be designed as a "green," energy efficient building. Each unit will have one or two full bathrooms and modern kitchens with brand new Energy Star appliances. All units will be graciously sized in excess of the requirements of the building code and will have individual hot water heaters, high-efficiency heating and air conditioning, hardwood floors, and ceramic tiled kitchens and baths. The first floor will contain a lobby and covered parking (more than two spots per apartment in total). There will be three large community rooms and plentiful outdoor open space. The community rooms will provide an area for social, educational, and other opportunities for the residents. In addition, the Development will be located on a

beautiful landscape with mature trees lining its perimeter with an additional 47 trees and 150 diverse shrubs to be planted.

54.     The Development will be the first 100% affordable project ever built in Edgemont and provide its first and only affordable units. Because of existing zoning restrictions, the Property is the only location in Edgemont where multi-family housing can presently be built.

55.     Plaintiffs hope that the Development can become a model for affordable housing throughout the United States and further the social goals of providing opportunities to those who need them most. The Development's site plan and location are particularly well suited for affordable housing because it is close to public transit that provides access to employment centers such as New York City, White Plains, and Yonkers, commercial service establishments along Central Avenue, public schools that have been ranked number one in the country, and recreational facilities.

**F.      S&R's Due Diligence and Acquisition of the Property**

56.     Before purchasing the Property, S&R conducted extensive due diligence regarding its potential acquisition and development. Initially, S&R examined a copy of the Official Town Zoning Map displayed in Town Hall from 2000, which showed the Property to be in the CA Zone. Subsequently, Richard Troy visited the Town Public Library and examined the immediate predecessor to the 2000 Official Town Zoning Map, *i.e.*, the November 1997 version. This map also showed that the Property was in the CA Zone. Earlier versions of the official map were not available for examination, but the Property was designated as zoned CA in Official Town Zoning Maps from 1997, 2000, 2003, and 2006, which all established that the Property was in the CA Zone.

57.     S&R also met with Peter Gaito, a licensed architect based in Westchester County who was familiar with the Town's zoning ordinance. He reviewed the Official Town Zoning

Map and confirmed that the Property was in the CA Zone. Mr. Gaito explained that a permitted use of the Property, in accordance with Town Code § 285-29.1(B)(3)(a), would allow a multi-family development, four stories in height, with a maximum density of 35 bedrooms per acre.

58.    The Troys and their architect, Mr. Gaito, met with then Deputy DCDC Commissioner Madden, who also confirmed that the Property was zoned CA. At that time, Madden expressed no concerns about the Development's potential impact on the environment, open space, the neighboring GNC, or water and sewer capacity. He stated that there should be no obstacles to development of a multi-family complex and expressed the hope that the Development would be consistent with the architectural style of the adjacent Scarsdale Woods complex.

59.    S&R hired an appraiser, Howard Gelbtuch, MAI, CRE, FRICS, who valued the Property at $10.2 million as of September 22, 2005 relying on the fact that the Property was located in the CA Zone. Mr. Gelbtuch's identification of the Property's zoning was supported by a letter from Gary Spilatro, a licensed architect with extensive zoning experience throughout Westchester County. Mr. Spilatro confirmed that the Property was in the CA Zone and could be lawfully developed with a multi-family complex containing up to 82 one-bedroom units.

60.    On May 24, 2006, S&R closed on the acquisition of the Property and S&R has since been the owner in fee. At the time of acquisition, the Property was improved with a large single family home and swimming pool. S&R then proceeded with and completed the demolition of the home and pool.

61.    The demolition triggered opposition by the GNC and Supervisor Feiner to multi-family development on the Property. Once the demolition had begun, then GNC Executive Director William Lawyer warned S&R's attorneys that the GNC would oppose any development of the Property containing more than one or two homes.

62.     Then GNC Executive Director Lawyer then contacted Supervisor Feiner, who promptly announced his opposition to any development on the Property. Supervisor Feiner stated in a December 10, 2006 web log entry that he intended to "[i]nitiate" an "effort to protect Greenburgh Nature Center from possible development [at] 1 Dromore Road," and would "[r]each out to state/county/private individuals for assistance in obtaining [the] property."

63.     On December 19, 2006, Richard and Stephen Troy, S&R's architect, engineer, and attorney participated in a pre-submission meeting at the Town Hall with then DCDC Commissioner Stellato and then DCDC Deputy Commissioner Madden. This meeting was a prerequisite for S&R to submit a site plan.

64.     At this meeting, S&R proposed an initial development plan for the Property that would comply with all requirements for the CA Zone and require no variances for development of a four-story building containing 37 market-rate, two-bedroom apartments. The building's footprint would cover only 30% of the site and include generous green corridors and spacious setbacks. Neither then DCDC Commissioner Stellato nor then Deputy DCDC Commissioner Madden raised any doubts about the Property's location in the CA Zone or the plan's compliance with the Town's zoning ordinance. To the contrary, they raised only two minor issues concerning the amount of open space within the building envelope and avoiding any disturbances of steep slopes. As the meeting concluded, though, Stellato warned the Troys that they should be aware of recent public comments other Town officials had made in opposition to the Development.

**G.     Defendants Attempt to Implement an Illegal Moratorium on All Development**

65.     Unbeknownst to S&R, by the time of the December 19, 2006 pre-submission meeting, Town officials, the GNC, and Edgemont community activists already had joined together to prevent S&R from developing the Property. For example, the Greenburgh

Conservation Advisory Council had voted on December 18, 2006 (the day before the pre-submission meeting) to assist the GNC in acquiring the Property from S&R.

66.     In January 2007, the Town and other Defendants rushed to promulgate a moratorium on development that was intentionally crafted to target the Property. The proposed moratorium was not accompanied by any of the types of land-use studies that would be necessary to justify a legitimate moratorium. Rather, the Town's proposed moratorium was intended (1) to prevent lawful development of multi-family housing on the Property and (2) to coerce S&R to convey the Property to the Town, the GNC, or an alter ego of the Town for a fraction of its worth.

67.     On or about January 1, 2007, on the Town's website, Supervisor Feiner reiterated his opposition to development of the Property, stating that his "goals" for 2007 included "[p]resent[ing the] Town Board with options (including acquisition of property/conservation overlay zones/compromise) to protect Greenburgh Nature Center from development that can have a negative impact on wildlife/habitats/eco system," and "[r]each[ing] out to state/county/private individuals to determine if a partnership can be established regarding possible acquisition" of the Property.

68.     On January 4, 2007, Supervisor Feiner stated on his web log that he would ask that a resolution for a public hearing on a development moratorium be placed on the agenda for the Town Board's upcoming January 12, 2007 meeting.

69.     On January 5, 2007, *The Scarsdale Inquirer* reported that former-Councilman Steven Bass had spoken to then DCDC Commissioner Stellato in late December 2006, had told him to put the moratorium on the Town Board's agenda in January, and had successfully urged the GNC's board to support the moratorium. The next day, the press reported on the

Greenburgh Conservation Advisory Council's December 18, 2006 vote to assist the GNC in preventing the Development.

70. On January 7, 2007, *The Journal News* reported on the proposed moratorium, including a statement by Supervisor Feiner that, if S&R wanted too much money for the Property, the Town could try to acquire it through eminent domain. That same day, Supervisor Feiner stated on his blog: "I intend to aggressively pursue the moratorium on residential development on Central Ave…. I am concerned about the impact residential development on Central Ave will have on the Edgemont School District."

71. On January 8, 2007, in a surprising announcement directly contradicting his statements at S&R's December 19, 2006 pre-submission meeting, then DCDC Commissioner Stellato submitted to the Town Board a recommendation for a moratorium. The recommendation was based on a draft prepared by Michelle McNally, then-President of the Edgemont Community Council ("ECC"), an influential neighborhood association within the Town.

72. A tentative agenda for the January 10, 2007 Town Board meeting included a proposal that the Town Board consider scheduling a public hearing within the next 30 days on a blanket moratorium against multi-family development in the CA Zone.

73. At the January 10, 2007 Town Board meeting, various individuals supported a building moratorium. Streaming video on the Town's website recorded the meeting. Pertinent comments include:

(a) Mr. Bernstein of the ECC stated that the ECC would do whatever it took to impose the moratorium. He urged the Town Council to schedule a public hearing on it for January 24, 2007.

(b) A GNC representative stated that the GNC's board had voted unanimously to support the moratorium and hoped that it would be approved as soon as possible.

(c) Ms. McNally of the ECC, urged the Town Board to place the moratorium on its agenda as soon as possible and stated that she had been "working with" then DCDC Commissioner Stellato, who "has been great."

(d) Bill Greenawalt, Chairman of the Parks Commission and a former candidate for Town Supervisor, expressed his support for the moratorium, stating that he wanted it on the Town Board's agenda quickly. He referred to "a serious problem on Central Avenue" and that the moratorium was needed to prevent multi-family development of the Property.

74.    On January 12, 2007, the Town Board held a special meeting to consider enactment of a local law imposing a 180-day moratorium on the filing, acceptance, and approval of all applications for site plan and subdivision approvals in the CA Zone. There was no discussion of the moratorium's usefulness or purpose. The Town Board did not have the benefit of any studies by the DCDC. The resolution also falsely stated that the moratorium was being imposed pursuant to a comprehensive plan when there was no such plan. The moratorium was drafted by Town Attorney Lewis, with assistance from Ms. McNally of the ECC.

75.    On January 13, 2007, Supervisor Feiner stated on his blog: "I anticipate that a moratorium will be approved in the near future. Edgemont leaders have expressed concern about the impact additional residential development on Central Ave will have on the Edgemont school district." He elaborated on January 21, 2007, stating that "[r]esidential development means more students to educate and more expenses for school districts."

76.    On January 17, 2007, S&R wrote to the Town Board to provide detailed objections to the proposed moratorium. On January 18, 2007, S&R's land-use counsel met with Supervisor Feiner, former-Councilman Bass, and representatives of the GNC. S&R offered a number of compromise proposals, including reducing the scope of the Development. These proposals were rejected. GNC Executive Director Goldberg stated that S&R should make an

immediate gift of the Property to the GNC and that the GNC would try to raise money to compensate them at some later date.

77. On January 24, 2007, S&R wrote to the Town Board expressing its willingness to reach a compromise, requesting a meeting with the Town Board's members, and asking for a delay in the enactment of the moratorium. Notwithstanding S&R's request, later that day, the Town Board held its public hearing on the proposed moratorium.

78. At that meeting, then DCDC Commissioner Stellato reversed his position and spoke in favor of the moratorium, recommending that residential development in the CA Zone should be 50% less dense. Mr. Bernstein of the ECC stated that there were enough multi-family dwellings in the Town and that he did not want increased Edgemont school enrollment. In addition, Ms. McNally of the ECC spoke about a potential spike in school enrollment, mentioning the Property in particular, and the fact that S&R wanted to build 37 units.

79. On January 27, 2007, the Troys hosted a meeting at S&R's office attended by former-Councilman Bass and Councilman Sheehan, Mr. Bernstein and Ms. McNally of the ECC, and then-GNC President Sims. Councilman Sheehan stated that if anyone disclosed the topics discussed at the meeting with Supervisor Feiner, he would disavow any agreement that was reached. The attendees also insisted that S&R not relate any discussions that took place at the meeting to Hal Samis, a commentator on Greenburgh politics. At the meeting, the attendees discussed the possibility of a quasi-governmental agency of the Town acquiring the Property, or an interest therein, at S&R's cost.

80. On January 31, 2007, S&R wrote to the Town Planning Board in anticipation of the Planning Board's February 7, 2007 meeting, protesting that, unlike the careful deliberation that had preceded the Town's enactment of a moratorium in 2001, this hasty process was devoid of any proper basis or analysis.

81.     Within days of the Town's announcement of the Moratorium, on January 31, 2007, the Westchester County Planning Board wrote to the Town questioning the motivation for it: "The fact that the moratorium singles out multifamily dwellings within the Edgemont School District as the only example of why this proposed moratorium is necessary, raises questions about the moratorium's intent."

82.     Following abandonment of the Moratorium, Mr. Bernstein and Ms. McNally of the ECC, and their Town Board allies, principally Councilman Sheehan and former-Councilman Bass, tried to pressure S&R into conveying the Property to Bernstein for a fraction of its worth.

83.     On February 2, 2007, S&R received from Mr. Bernstein of the ECC a proposed agreement, which provided for S&R to gift the Property directly to him in his individual capacity. S&R rejected this unusual proposal.

84.     Also on February 2, 2007, S&R's as-of-right application for site plan approval for the Property was formally submitted to the DCDC.

85.     On February 3, 2007, the S&R hosted another meeting at its office, which was organized by former-Councilman Bass and attended by former Town Board member Eddie Mae Barnes, Councilman Sheehan, Councilwoman Diana Juettner, and by Mr. Bernstein and Ms. McNally of the ECC. According to Sheehan, the meeting was intended to allow the other members of the Town Board to meet S&R's principals in person, since they soon would be asked to vote on a memorandum of understanding with S&R.

86.     At this meeting, S&R reiterated its willingness to discuss compromise proposals, including reducing the scope of the Development.

87.     At a February 7, 2007 Planning Board meeting, then DCDC Commissioner Stellato and then Deputy DCDC Commissioner Madden distributed "hand-outs" and responses

to previously-submitted questions, which confirmed that their motivation for opposing the Development was to protect the Edgemont School District from having to enroll children who likely would reside in a multi-family development. The hand-outs included documents entitled: (a) "Comparison of School Districts in the Town of Greenburgh"; (b) "Overall Student Enrollment Percent Increase"; (c) "Standard Multipliers" – how many children live in each apartment in Stone Ridge Manor; (d) "Residential Demographic Multipliers"; (e) "Town of Greenburgh School District Enrollment, 1998-2006"; (f) "Population Density, 2000"; and (g) "Number of Potential School-Age Children Among Developable Sites Along Central Avenue."

88.     On February 14, 2007, the Troys, along with one of their attorneys and two engineers, met with then Deputy DCDC Commissioner Madden regarding the formal submission of S&R's as-of-right development, which called for the development of 37 units on the Property. For the third time in as many meetings with the Town's land-use officials, no questions were raised regarding the Property's zoning classification as CA. Madden's comments were directed exclusively to technical details regarding the Development, including the creation of open space, the possibility that steep-slope disturbances might require SEQRA review, S&R's possible future commissioning of a traffic study, the creation of a tree protection program, the possible inclusion in the building of a truck loading dock, the submission of a lighting plan showing Con Edison easements, and the identification of any drainage channels.

89.     On February 14, 2007, S&R again wrote to the Town Board, arguing that the moratorium should not be enacted and urging the Town Board not to "surrender to political pressure and hysteria from certain members of the Edgemont community."

90.     Approximately one week later, Richard Troy received a telephone call from former-Councilman Bass, who urged Mr. Troy to "trust" him and urging S&R to gift part of the Property. Mr. Troy declined this proposal.

91.     Because of the Westchester County Planning Board's inquiry into its intent and effect, the proposed moratorium was ultimately abandoned. In an open letter published in July 2007, Supervisor Feiner admitted that the proposed moratorium had been directed only at the Property. Defendants then proceeded to find another way to block the Development.

**H.     Defendants' Illegal Alteration of the Town's Official Zoning Map**

92.     Following S&R's refusal to gift the Property at former-Councilman Bass's request, on February 26, 2007, Bass sent a blast e-mail to the Town's e-mail database, in which he asserted that the Property was zoned R-20, not CA as all of the official maps indicated and as everyone had acknowledged up until this point. The R-20 Zone is classified as a "One Family Residence District" in the Town Code, and multi-family housing is not a permitted use in the R-20 Zone.

93.     That same day, then DCDC Commissioner Stellato issued a deliberately timed and novel determination in which he stated that the Property was situated in an R-20 zone due to an error in the Town's Official Zoning Map (the "Stellato Determination"). Stellato thereafter directed Michael Lepre, the Town Engineer, to manually alter the Town's Official Zoning Map with a pen to change the zoning designation of the Property from CA to R-20. Mr. Lepre complied.

94.     No notice was published or sent to S&R regarding this alteration of the Town's Official Zoning Map. No public hearing was held before this alteration nor was any official Town Board action taken to authorize this modification.

95.     A March 2, 2007 article in *The Scarsdale Inquirer*, referring to the CA zoning of the Property, reported that Councilman Sheehan purportedly had "caught the mistake last week while tracing the map's evolution over the years." Even Mr. Bernstein of the ECC, was reported to have stated that more oversight was necessary in the future and to have admitted that "[t]he ultimate bible is the town's zoning map."

96.     Shortly after the Stellato Determination, former-Councilman Bass called Richard Troy and asked whether S&R would sell the Property for two or three million dollars. Bass believed that Defendants' political opposition, threats of condemnation, development moratorium, breaches of agreements, and illegal re-zoning attacks had driven down the value of the Property so that it could be purchased at a price far below its market value. Mr. Troy declined this proposal.

97.     By letter dated March 9, 2007, S&R's attorneys submitted to the Town a request for documents pursuant to the New York Freedom of Information Law, New York Public Officers Law § 84, *et seq.* ("FOIL"). Among other things, S&R's FOIL request sought all versions of the Town's Official Zoning Map and all legislation relating to the CA Zone. Town Attorney Lewis, acting as the Town's public information officer, approved S&R's FOIL request on or about March 25, 2007.

98.     In April 2007, S&R timely initiated an appeal to the ZBA from then DCDC Commissioner Stellato's purported determination that the Property was zoned R-20. On July 9, 2007, S&R submitted a 25-page sworn affidavit by Richard Troy in which, among other things, he recounted the numerous meetings and hearings at which Town officials had confirmed that the Property is in the CA Zone, as well as his extensive communications in which Town officials and representatives of the GNC and the ECC attempted to force S&R to sell the Property at a fraction of its worth.

99.     Although the Town had approved S&R's FOIL request on March 25, 2007, it did not make any responsive documents available to S&R until July 11, 2007—two days after the ZBA's deadline for S&R's appeal of the Stellato Determination.

100.     The Town's response to S&R's FOIL request included a computer disc that contained depictions of the Town's Official Zoning Map as of September 29, 1932; April 25, 1952; August 6, 1957; June 2000; June 2006; and February 2007—the last map being the one reflecting the contested change then DCDC Commissioner Stellato had directed. The Town's response did not include any copies of its Official Zoning Map published in the years from 1957 through 1999, a 42-year gap.

101.     Unknown to S&R at the time, then DCDC Commissioner Stellato's had improper *ex parte* communications with the ZBA and/or its Chair, Steven Belasco, before the ZBA's first public hearing and after the Town realized it had no Official Zoning Maps to establish that the Property was not in the CA Zone.

102.     On July 19, 2007, then DCDC Commissioner Stellato submitted a memorandum to the ZBA in opposition to S&R's appeal. Stellato argued that the Town Board created the CA Zone in May 1978, that the Property was not initially included in the CA Zone, and that the DCDC could find no evidence that the Property had ever been included in the CA Zone.

103.     Also on July 19, 2007, S&R submitted a memorandum arguing that the Official Town Zoning Maps unambiguously placed the Property in the CA Zone, including the map from 2006, which according to the Town Code was "the final authority as to the zoning classification of property."

104.     Because the Town Clerk failed to keep a file cabinet or drawer of every Official Zoning Map adopted by the Town as required by N.Y. Town Law Section 264(1), Defendants had no Official Zoning Maps to rebut S&R's claim that the Town had no competent evidence

as to the boundaries of the CA Zone as created in 1978 and as enacted in the June 1980 Zoning Ordinance and Official Zoning Map.

105. To fill the glaring gap in the Town's zoning records, then Deputy DCDC Commissioner Madden began placing calls to various Town departments and agencies, asking for any zoning maps they had in their possession. Madden accumulated these unofficial maps and relied on them to prepare a memorandum to the ZBA, dated August 8, 2007, in the name of then DCDC Commissioner Stellato, which questioned whether the Property had ever been situated in the CA Zone. This memorandum failed to disclose to the ZBA the questionable provenance of what would come to be known as the "miraculous" maps. Madden and Stellato submitted this memorandum to the ZBA, even though both knew that their assertions lacked credibility and were not based on any of the Town's Official Zoning Maps.

106. S&R, through its attorneys, subpoenaed then DCDC Commissioner Stellato to testify before the ZBA regarding his research, his recommendations, and the bases, if any, for his conclusion that the Property was not situated in the CA Zone. Stellato failed to appear at the August 16, 2007 ZBA meeting as required by the subpoena. The ZBA did not enforce S&R's subpoena or require Stellato to give sworn testimony to the ZBA.

107. On October 19, 2007, the ZBA voted to sustain the Stellato Determination that the Property was zoned R-20, with five members of the ZBA voting to deny S&R's appeal and one member dissenting.

108. On November 9, 2007, the ZBA's written decision was filed in the office of the Town Clerk. This decision contained a two-page statement of findings that essentially held that the then-current version of the Official Zoning Map, which had been manually changed in February 2007 at then DCDC Commissioner Stellato's direction, indicated that the Property was zoned R-20 and that S&R had failed to sustain its burden of showing that the Property ever

had been zoned CA. The dissenter, Rohan F. Harrison, a lawyer, issued a 19-page opinion in which he concluded that: (i) the Town had a legal obligation to preserve the relevant historical zoning maps and documentation but had failed to fulfill that duty by losing the documentation for a period of decades; (ii) the ZBA erred by placing the burden on S&R to produce documentation showing that the Property had been zoned CA when it was undisputed that for many years the Town's Official Zoning Map showed the Property to be zoned CA; (iii) Stellato had not changed the Official Zoning Map pursuant to legislative authorization; and (iv) S&R had provided significant evidence of collusive conduct by Town officials and activists to change the Official Zoning Map to prevent the Development and to coerce S&R into selling the Property for a below-market value to a purchaser the Town favored.

I.      **Defendants Force S&R into Costly and Time-Consuming Litigation**

*The 2007 Federal Action*

109.   On or about December 5, 2007, S&R commenced an action in the United States District Court, Southern District of New York alleging federal and state law claims (the "2007 Federal Action"). The court found in a decision dated September 26, 2008 that S&R's federal claims were unripe because the Town had not yet issued a final decision on the Development. *See S&R Development Estates, LLC v. Bass et al.*, No. 07-11112 (S.D.N.Y. Sept. 26, 2008) (Conner, J.). It thus also declined to exercise supplemental jurisdiction over the state law claims, including S&R's Article 78 claim against the ZBA. Therefore, the 2007 Federal Action was dismissed without prejudice.

110.   Of note in the 2007 Federal Action, then Deputy DCDC Commissioner Madden, in a sworn declaration in support of the Town's motion to dismiss the complaint, attached copies of several maps claiming they were "Official Zoning Maps."

111.  On April 10, 2008, the CPSC had an "Open Group Visioning" meeting with Edgemont community residents, who made clear that they opposed additional multi-family development along Central Avenue. Their comments included the following:

(a) "The County continues to push for multifamily dwellings on Central Avenue. This negatively impacts our schools. Demographic changes in Edgemont have exacerbated this issue."

(b) "No more multifamily development within the Edgemont School District."

(c) "Co-ops and condos are assessed by [an] income approach and don't pay enough taxes to make up for the number of kids in the school district."

(d) "Edgemont has good schools, but there is pressure on the schools from multifamily housing on Central Avenue."

(e) "Development of multifamily housing in Edgemont will destroy the school system and the tax base."

112.  On December 18, 2008, S&R petitioned the ZBA for a use variance to build a four-story, 87-bedroom, multi-family, affordable rental housing development. The Planning Board held a meeting on March 4, 2009—without providing notice to S&R—at which it seized responsibility for making the environmental findings necessary to issue the variance.

113.  On March 12, 2009, the ZBA announced it would not review S&R's application for a variance until the Planning Board made its determinations. The ZBA effectively used the Planning Board's environmental studies, which were expected to be unduly drawn out, to delay the ZBA's consideration of S&R's zoning variance application. Counsel for S&R subsequently requested immediate and proper review of the variance application, explaining that granting the variance would help integrate Edgemont.

114.  In response to S&R's presentation of its affordable housing site plan, the GNC, the ECC, and other Edgemont residents gathered in a common effort to frustrate the Development. On April 27, 2009, an article was posted on local community website, Scarsdale10583.com, urging Edgemont residents to fight the Development and explaining that

45 Edgemont residents had met the day before at a private home to discuss S&R's use variance application, and that the key speakers had been Michelle McNally and Bob Bernstein.

115.    An e-mail dated April 26, 2009 from Margaret Goldberg, then Chairwoman of the Board of the GNC, to Bob Bernstein, Michelle McNally, Kurt Hundgen (then Executive Director of the GNC), and board members of the GNC explained what was discussed at that meeting. She wrote: "kurt, meeting held today within Edgemont in re: dromore, etc. it was suggested that ecc, gnc, ed feig, the nuns, etc get together to discuss a game plan....would you like to setup a date/time to meet at the gnc? i believe cards/names had already been exchanged. best, margaret."

*S&R v. Feiner I*

116.    On January 22, 2009, shortly after the dismissal of the 2007 Federal Action, S&R filed an Article 78 proceeding in the Supreme Court of the State of New York, Westchester County, challenging the ZBA Decision.

117.    Justice Loehr ordered the depositions of six Town employees because "the suspect alteration of the Official Zoning Map in the face of community pressure calls for discovery to explain and justify such action."

118.    The depositions unearthed extensive misconduct by Defendants, including illegal acts, misrepresentations, and gross abuses of power. For example:

 (a) Then DCDC Commissioner Stellato admitted knowing he lacked authority to order anyone to alter an Official Zoning Map, but did so anyway;

 (b) Then Deputy DCDC Commissioner Madden offered conflicting testimony by stating that he "never heard anyone refer to anything as the official zoning map" even though, in his sworn declaration in the 2007 Federal Action, he had used the term "Official Zoning Map," attached several maps to his Declaration, and referred to those maps as "Official Zoning Maps";

 (c) Stellato admitted that he relied on unofficial zoning maps both to make his initial determination that the Property should not have been zoned CA and to support that determination in his memoranda to the ZBA;

31

(d) Madden admitted that what he referred to in in his federal court declaration as "Official Zoning Maps" were in truth maps that he had cobbled together from various Town departments and agencies and other unidentified sources; and

(e) Councilman Sheehan admitted that the Town was advised that no New York legal authority existed to "correct" a zoning map the way the Town had done.

119. After almost three years of litigation, on January 11, 2012, based on S&R's voluminous evidence of the Town's illegal acts, abuse of power, and official wrongdoing, including false deposition testimony and the absence of any Official Zoning Maps between 1957 and 1999, Justice Loehr issued a Decision and Order overturning the ZBA Decision and finding that there was no mistake in the Official Zoning Map. *See S&R Development Estates LLC v. Feiner*, Index No. 1904/09 (N.Y. Sup. Ct. Westchester Cty. Jan. 11, 2012) (the "*S&R v. Feiner I Order*").

120. The court referred to the unofficial maps relied upon by Defendants as the "miraculous" maps. The court concluded that the ZBA decision placing the Property in the R-20 Zone based on a supposed error in the maps was ***not based on evidence but was arbitrary and capricious, based on community pressure and bad faith.*** The court stated that "Respondents are not being estopped from enforcing the zoning laws; they are being enjoined to enforce them."

121. Reaction by the Town and Edgemont residents to the *S&R v. Feiner I Order* was swift and contemptuous. In a January 20, 2012 article in *The Scarsdale Inquirer*, Mr. Bernstein of the ECC objected to the impact on the Edgemont School District "because of the large number of children who would likely have to be enrolled. The tax impact would not pay for that enrollment." Supervisor Feiner stated he "would be open-minded toward appealing the decision if the Town Attorney's office said there were benefits."

122. Then ECC First Vice President Marc Ackerman, in a letter to the *Scarsdale Inquirer* said he read "with alarm the recent court decision which would allow multi-family

development of Dromore Road." Ackerman opined that "[t]he ruling is clearly in error and should be reconsidered or immediately appealed," that if the Town would not appeal, the ECC should "find appropriate parties to intervene," that the ruling "deprives us and the residents of the Edgemont School District of their rights under state law," and that he "cannot understand how the Court could have been allowed to make such an error." Ackerman concluded that the Town should "seek an immediate stay of the Court's ruling, and immediately appeal to the Second Department" and that the Town "should take immediate steps to amend the incorrect Zoning Map."

123. At the January 25, 2012 Town Board meeting, Town Attorney Lewis announced that the Town had appealed. Notwithstanding the court's Order, Supervisor Feiner told the audience, "I have no problem changing the map," "I can assure you the actions we are taking are most advantageous to the Edgemont Community," and "We are a team. We have the same goals. The Town and the Edgemont Community have the same goals."

124. The next day, in a January 26, 2012 Facebook posting, the ECC stated that the Town had appealed. The ECC falsely claimed that filing the notice of appeal automatically stayed any action on S&R's site plan and, remarkably, stated that "it is especially important for the Town to undertake to correct the Zoning Map to remove any uncertainty over the correct zoning of the Dromore Road property so that in the event the ruling below is affirmed the correct zoning will be in place."

125. The following day on January 27, 2012, a series of e-mails between Supervisor Feiner, Town Attorney Lewis, then ECC President Loftus, and then Town Building Inspector John Lucido were posted on the ECC's Facebook page. These e-mails revealed that (i) Feiner had asked Lucido to advise the Board before any permits were issued on Dromore Road (a highly unusual procedure for the Building Inspector to follow, particularly on a project of this

magnitude), and (ii) Lewis advised Loftus and the ECC community that referencing "potential impacts to the Edgemont School District are not beneficial to the Town. The impact on the school district, whether it be the number of students or the make-up of students, *is an impermissible factor for consideration*. These types of articles are a real source of concern because they could be revealed and provide additional fuel for litigation."

126. In a second Facebook posting that same day, the ECC took Supervisor Feiner and Town Attorney Lewis to task for not agreeing in advance to illegally refuse to process S&R's application for site plan approval.

127. Also on January 27, 2012, Ed Krauss, an Edgemont resident and ECC Director, published a letter in *The Scarsdale Inquirer* that voiced the animus of Edgemont residents against affordable housing in their community: "If there was ever a compelling reason for Edgemont to become a village, Dromore Road is it! If Edgemont were a village, things like this wouldn't happen. Think about it: we can't even defend our own school district. OUR OWN SCHOOL DISTRICT! Dromore Road is the 'firing on Fort Sumter,' 'the assassination of Archduke Franz Ferdinand,' 'the bombing of Pearl Harbor.'"

128. On February 1, 2012, the ECC posted on its Facebook page e-mail exchanges between the ECC and Town Attorney Lewis. The ECC expressed frustration with the Town Attorney because the Town was not moving immediately to enact a new Official Zoning Map that would block the Development. The Town Attorney, presumably in recognition of both the illegality of such an act and the illicit motives underlying the ECC's efforts to block multi-family housing in their enclave, responded that he was in possession of confidential information, which he was willing to discuss, but preferred not to respond in writing. This only further infuriated the ECC.

129.     Sometime before February 1, 2012, the ECC posted on its Facebook page excerpts from Supervisor Feiner's deposition transcript. In an effort to control the damage, Feiner downplayed his deposition testimony in which he "could not recall" basic facts 81 times. Feiner told *The Scarsdale Inquirer*, "I could have put more things on the record, ***but I chose not to because I did not want to hurt the Town***."

130.     Supervisor Feiner has a history of being evasive in court proceedings. In *Fortress Bible*, Judge Robinson stated that "In light of Supervisor Feiner's prior testimony throughout his trial, this Court was troubled by his refusal to answer a simple question and gave his counsel the opportunity to speak with him about answering the questions truthfully."

**J.     Defendants Block S&R's Attempt to Proceed with Its Site Plan Application**

131.     S&R attempted to proceed with its site plan for affordable multi-family housing following *S&R v. Feiner I*. On February 15, 2012, S&R filed its as-of-right application for site plan approval to construct 45 affordable housing units in one multi-family building on the Property and was scheduled to appear before the Planning Board on March 21, 2012.

132.     S&R's application for site plan approval caused a flurry of activity. The Town Board scheduled a special meeting for February 28, 2012 to consider a resolution requesting that, notwithstanding the court's order, the CPSC review the Town Zoning Map and any amendments thereto since 1980 and recommend changes to the Town Board. The Town Board unanimously adopted that resolution.

133.     Sheehan, Madden, McLaughlin, Simon, Tori, Klein, Taliaferrow, Preiser, and O'Shea—an Edgemont community activist who has long opposed the Development—were members of the CPSC. In defiance of the court's order, the CPSC found that: (i) there was a mistake in the Official Zoning Map; and (ii) the proper zoning of the Property was R-20, not

CA. The CPSC recommendation was based upon the precise reasoning Justice Loehr had found arbitrary and capricious, contrary to law, and implemented in bad faith.

134. On March 1, 2012, the ECC established a "Dromore Defense Fund" and sent a solicitation letter to Edgemont residents stating that "the ECC believes the prudent course of action would be for Edgemont residents to intervene on behalf of the Town to insure that a properly briefed appeal is undertaken expeditiously and vigorously pursued." The letter continued that, "[o]nly Edgemont residents in close proximity to the Dromore property may seek to intervene," that one resident has stepped forward, and that an Edgemont attorney would take the case *pro bono*. On information and belief, Mr. Bernstein of the ECC was the attorney referenced in the letter.

135. On March 19, 2012, the Town advised S&R's attorneys that it would be seeking a stay of the court's order so that the Planning Board would not have to hear or process the S&R application for site plan approval.

136. On March 20, 2012, the Town sought a temporary restraining order from the Appellate Division, Second Department to prevent S&R from appearing before the Planning Board on March 21, 2012. The Appellate Division denied the TRO and, in April 2012, denied the Town's motion for a stay.

137. On March 21, 2012, S&R, its attorneys and engineers, appeared before the Planning Board. At the outset, the Planning Board Chairwoman McLaughlin read off an exhaustive list of items that the Planning Board required S&R to study and report back as a prerequisite for site plan consideration.

138. S&R began the timely and expensive process of complying with these requests, including the retention of an architect to prepare elevations of the proposed building, renderings of proposed architectural features, and redrawn plans to change the orientation of

the building on the site. S&R also authorized its engineers to commence the various studies and design alternatives, as the Town demanded, including a landscaping plan, refuse/recycling operations, traffic analysis, utility analysis, and deep pit tests. S&R also prepared for a third time the following documents: Site Plan Application; Wetland Clearance Form, Environmental Clearance Form; Steep Slope Clearance Form, Part I EAF; and, a Tree Removal Permit Application.

139.    Planning Board Chairwoman McLaughlin did not disclose to S&R or others that she was a member of the CPSC, the committee that was then studying and recommending changes to the Town Official Zoning Map, including changing the zone of the Property from CA to R-20. Nor did she advise S&R or the meeting's attendees that the Planning Board had received a letter from the ECC, signed by Mr. Bernstein, opposing S&R's affordable housing site plan application.

**K.    Defendants Continued Use of Litigation to Delay the Development and to Challenge the Article 78 Ruling**

140.    While S&R and its professionals were compiling the analyses and documents to respond to the Planning Board's requests, on May 4, 2012, four residents of Scarsdale Woods Condominium, which is a 120-unit condominium adjoining the Property, commenced an Article 78 proceeding against the Town, S&R, and the Town Planning Board (the "*Ross Proceeding*"). Consistent with the plan disclosed in the ECC's Facebook postings, these petitioners were recruited by the ECC, were represented *pro bono* by Mr. Bernstein, and claimed to be "aggrieved" by Justice Loehr's decision in *S&R v. Feiner I*. The petition sought to re-litigate the same issues decided by the Court in *S&R v. Feiner I*. It also sought an injunction to halt the Planning Board's review of S&R's site plan for affordable multi-family housing on the Property.

141. On May 17, 2012, at the ECC's request, Supervisor Feiner, Councilman Sheehan, Town Attorney Lewis, and seven other Town officials attended a general meeting of the ECC. Even though the Town and its officials were respondents in the *Ross* Proceeding, Feiner stated that the Town would support the *Ross* petitioners; that the Town would complete their appeal of *S&R v. Feiner I* by June 2012; and that the Town, in blatant defiance of the court's order, was moving ahead with its second attempt to change the Official Zoning Map (and the zoning status of the Property from CA to R-20). Feiner stated the zone change legislation should be ready for adoption in July 2012. In addition, Town Attorney Lewis reported that the CPSC was moving ahead with recommendations to change the Official Zoning Map and the Town was hopeful that Planning Board Chairwoman McLaughlin, who is a member of the CPSC, would help expedite the process. Feiner publically confirmed that, notwithstanding *S&R v. Feiner I*, (a) the Town was going to take a "dive" in the *Ross* Proceeding, and (b) the re-zoning of the Property from CA to R-20 was a foregone conclusion.

142. Supervisor Feiner stated further "We are all on the same team. Our goal is the same as your goal. We want to make sure that the school district is protected. We want to make sure that the community is protected…. So, all I can say is I give you my assurances that the entire Town Board has directed the Town Attorney, the Town Attorney's office, to do everything possible to make sure that we are successful. We want to make sure it is not a multiple dwelling use…. We want to work with the Edgemont Community…. It could be a partnership. We are willing to sit down with attorneys from Edgemont, people who are community leaders in Edgemont, and work together in partnership to plan a strategy that would give us the best hand up."

143. Fulfilling Supervisor Feiner's promise to the ECC, the Town joined in the petitioners' collateral challenge to *S&R v. Feiner I*. The Town Board also hastily scheduled a

special meeting for May 25, 2012, the Friday before Memorial Day weekend, at 4:00 p.m., to consider: (i) a report from the CPSC recommending changes to the Official Zoning Map, (ii) an amendment to Town Code § 285-7(A), the section upon which the Court relied in *S&R v. Feiner I*, and (iii) a resolution finding that the proposed action was a Type II action under SEQRA, which meant no environmental review was necessary. Only S&R and its attorneys attended the meeting, which did not start until nearly 5:00 p.m. The meeting was brief. The Town Board adopted a resolution referring the CPSC report and proposed Town Code amendment to the Planning Board. S&R's attorneys delivered to the Town Board a letter protesting the contemplated changes and challenging its legality.

144.    On June 6, 2012, the Planning Board received the draft report from the CPSC and the text of the proposed amendment to Town Code § 285-7(A). The Planning Board scheduled a discussion of these items for June 20, 2012, the same day S&R's site plan would be before the Planning Board for consideration.

145.    At its June 20, 2012 meeting, the Planning Board considered the proposed amendments to the Town's Official Zoning Map and to Town Code Section 285-7(A). Several members of the Planning Board questioned the wisdom behind the change to Town Code Section 285-7(A) because the provision provides certainty to property owners in the event of a zoning ambiguity. Rather than risk losing the vote, Planning Board Chairwoman McLaughlin tabled the issue to a future meeting.

146.    Later at that same meeting, the Planning Board received a detailed presentation on S&R's site plan for affordable housing. The Planning Board members, with full knowledge of McClaughlin's intention to change the Property's zoning to R-20, requested that S&R expend further resources on its site plan application to: prepare architectural floor plans for the building; prepare a Stormwater Pollution Prevention Plan; consider installing additional

building entrances; install sidewalks from the Property to Central Avenue; convert impervious parking lot surfaces to pervious parking surfaces; and add additional landscaping and make other changes to the site plan. The Board tabled setting a public hearing on S&R's site plan to a future meeting. The Planning Board also scheduled a site walk of the Property for October 13, 2012, providing the CPSC, Planning Board, and Town Board with ample time to effect the re-zoning of the Property.

147.    At its meeting on July 18, 2012, the Planning Board considered the DCDC's draft report recommending approval of the proposed amendments to the Official Zoning Map change and to Section 285-7(A). After a brief discussion, the Planning Board approved the DCDC report and recommended approval of the proposed amendments. The proposed amendments included the illegal rezoning of the Property from CA (multi-family) to R-20 (single-family), in contravention of *S&R v. Feiner I.*

148.    At its next meeting, on July 25, 2012, the Town Board voted to schedule a public hearing on the proposed amendments. Before the meeting, S&R's attorneys delivered to the Town Board a letter objecting to the proposed amendments. The letter stated in pertinent part: "The Town has appealed Justice Loehr's order, which is its right. The Town cannot, however, simply ignore Justice Loehr's order, revisit the issue, find the same alleged error which Justice Loehr found did not exist and then correct the alleged error which does not exist. Well settled case law prohibits such conduct." The Town Board ignored S&R's objection and concluded the public hearing.

149.    At its September 12, 2012 meeting, the Town Board formally adopted resolutions amending the Official Zoning Map to again illegally re-zone the Property from the multi-family CA Zone to the single-family R-20 Zone and to amend Town Code Section 285-7(A) to delete the language that the Official Zoning Map shall be the final authority as to the zoning

classification of the Property within the Town. Simultaneously, the Town Board adopted resolutions determining that these amendments would have no significant adverse effect on the environment. In delaying the Development long enough to allow these amendments to pass, Defendants successfully deprived the Planning Board of authority to continue its review of S&R's site plan. S&R again formally objected in writing to Defendants' openly illegal conduct in blocking the Development.

150.   On October 13, 2012, the Planning Board held a site walk at the Property, knowing full well that the amendments approved by the Town Board one month earlier had already blocked the Development. The Planning Board recited its review of the proposed areas of disturbance, the proposed building footprint, the walkways, parking areas, landscaping, existing site conditions, and other relevant factors. The Planning Board raised no material objections to the site plan at that time. As such, S&R's plan was ready for a public hearing and final approval. But, as expected, on November 1, 2012 then Town Building Inspector Lucido advised that, due to the Official Zoning Map change, the Planning Board could no longer review S&R's site plan.

151.   By Decision and Order dated November 26, 2012, Justice Loehr granted S&R's motion to dismiss the petition in the *Ross* Proceeding, finding that it was barred by collateral estoppel and that the Town's second re-zoning of the Property was ineffective. *See Ross v. Town of Greenburgh*, Index No. 3043/12 (N.Y. Sup. Ct. Westchester Cty. Nov. 26, 2012). In other words, Justice Loehr ruled that the amendments to the Official Zoning Map and to Town Code Section 285-7(A) were not effective as against S&R. The court held that "what Petitioners are really trying to do is reargue and overturn this Court's January 10, 2012 Decision without having been parties to it or having intervened."

152.   It was reported by the ECC that Town Attorney Lewis was working in concert with Mr. Bernstein and that Lewis had urged Bernstein to file a notice of appeal in the *Ross* Proceeding as soon as possible, which he filed on December 3, 2012. The Town also filed its own notice of appeal in the *Ross* Proceeding.

**L.     Defendants Continue to Block Site Plan Approval and Vexatiously Re-Litigate Rejected Arguments**

153.   On December 3, 2012, in light of Justice Loehr's ruling in the *Ross* Proceeding, S&R's counsel formally demanded that the Town treat the Property as being in the multi-family CA Zone and proceed with the review of S&R's application. The Town's counsel did not address S&R's demand and the Town took no action on the application.

154.   Consequently, S&R was forced to commence yet another Article 78 proceeding to protect itself from the Town's illegal actions. On January 11, 2013, S&R filed in Supreme Court, Westchester County, an Article 78 proceeding entitled *S&R Development Estates, LLC v. Feiner*, Index No. 1099-13 (N.Y. Sup. Ct. Westchester Cty.) ("*S&R v. Feiner II*"). Notwithstanding the import of the outcome of the *Ross* Proceeding, S&R was forced to seek a judgment formally vacating, annulling, and setting aside the amendments and environmental adverse-effect determination adopted by the Town as they related to the Property.

155.   In response, the Town and Planning Board relented and agreed to restore S&R's site plan to the Planning Board calendar. Planning Board Chairwoman McLaughlin announced that the Planning Board would treat the Property as if it were in the CA Zone as Justice Loehr had held twice, until a court ruled to the contrary. The Deputy Town Attorney confirmed to S&R's counsel, in a letter dated January 2, 2013: "In response to your letter, dated December 17, 2012, footnote 7 of Justice Loehr's Decision and Order states, '…the amendment would only be effective as the date done and therefore does not affect S&R's property which, based on this Court's Decision, was in a CA district when S&R purchased it.' The Planning Board, in

reviewing your client's application, will follow the Decision and Order of the Court unless there is a subsequent ruling by a court with jurisdiction that modifies that Decision and Order." The Planning Board scheduled a public hearing on S&R's site plan for February 6, 2013.

156.   At the February 6, 2013 public hearing, CPSC member Preiser castigated the Planning Board members, and insisted that despite two rulings by Justice Loehr, the correct zoning of the Property was R-20, not CA. The Planning Board did not close the public hearing as would have been appropriate, but voted instead to continue it on February 20, 2013.

157.   Shortly thereafter, on February 19, 2013, the Town, undaunted by its string of losses, made an application in the Appellate Division, Second Department to appeal the *Ross* Proceeding and thereby obtain a stay of further Planning Board review pending a decision on the Town's appeal. The Town sought: (1) a stay of enforcement of the trial court's November 26, 2012 Decision and Order; (2) an order enjoining S&R from further pursuing any application for the Development while the appeal was pending; and (3) an order enjoining the Planning Board from further considering, or taking any action with regard to, S&R's application while the appeal was pending.

158.   For good measure, the Town simultaneously made a second stay application to the Appellate Division, Second Department, with respect to the related appeal of the *S&R v. Feiner I Order,* in which the Town sought identical relief, notwithstanding that the Appellate Division had denied the Town's prior stay application seeking substantially the same relief in a Decision and Order dated April 4, 2012.

159.   On the very same day the Town filed its stay applications, February 19, 2013, the Appellate Division, Second Department, denied them both. The Planning Board was required, therefore, to resume the public hearing on S&R's site plan.

160. When the Planning Board resumed the public hearing on S&R's site plan on February 20, 2013, members of the public repeatedly insisted that the Property was zoned R-20, despite Justice Loehr's rulings. Moreover, notwithstanding the Town's racially segregated housing problem, residents vociferously continued to oppose S&R's proposal and denied the need for affordable housing. Reflecting public sentiment, then Planning Board Member Decicco directly asked S&R: "you are proposing that 100% of the units be workforce housing?... I am wondering why?" The Planning Board voted to continue the public hearing until March 20, 2013.

161. Upon information and belief, prior to the February 20, 2013 public hearing, Planning Board member Golden, an Edgemont resident, communicated with Edgemont residents opposed to S&R's affordable housing about ways to block the Development. At the public hearing, Golden unveiled his strategy. He proposed that S&R be required to construct a sidewalk over property the Scarsdale Woods Condominium owned. Golden knew that Scarsdale Woods residents opposed S&R's site plan since they were Petitioners in the *Ross* Proceeding.

162. Planning Board member Golden went to great lengths to have the Planning Board public hearing record incorporate this condition, which he hoped S&R could not meet or would at least cause great expense and delay. As Golden announced at the hearing: "if S&R doesn't build the sidewalk they can't build the project." Golden also made the highly unusual demand that S&R file with the Planning Board a copy of their title report obtained before S&R purchased the Property.

163. At the next public hearing on March 20, 2013, in response to public questioning, Planning Board Chairwoman McLaughlin stated: "Presently the Planning Board, on advice of counsel, believes that according to the latest Court decision the project currently is in the

Central Avenue District, so we are proceeding on that since we have not had a stay and it's not been enjoined. We have not been enjoined. We have not been enjoined from proceeding with the hearing, so we are proceeding with the project." Planning Board member Walter Simon stated: "We know what zone it is. We might not like the Court decision, but the Court said it's in CA." When a member of the audience shouted out "No … No," Mr. Simon continued, stating: "We might not like it, but until the Court makes a change, that's what we have to— that's what we're working on. Now you could disagree with that, but I'm saying that our counsel advised us that that is the decision of the Court and that's what we are working on."

164.   The Planning Board determined that the project would not have significant adverse environmental impacts, meaning that S&R's proposal required no variances and was correctly designated as being in the CA Zone. Mr. Bernstein of the ECC nevertheless spoke at great length about why he considered the Development the equivalent of a "tenement."

165.   The Planning Board took no action and further adjourned the public hearing to April 17, 2013, rather than the next scheduled public hearing of April 3, 2013, stating that "perhaps by that time we'll have heard something from the courts."

166.   In a Decision and Order dated April 10, 2013, the Appellate Division denied the Town's second application for a stay pending the appeal of Justice Loehr's *S&R v. Feiner I Order*. In a separate Decision and Order also dated April 10, 2013, the Appellate Division also denied the Town's application for a stay pending the appeal of Justice Loehr's *Ross* order. Moreover, the Appellate Division "on the Court's own motion" dismissed the Town's cross-appeal on the basis that, as a respondent in the *Ross* Proceeding, the Town was "not aggrieved" by that ruling.

167.   Nonetheless, Mr. Bernstein of the ECC incomprehensibly claimed victory. He wrote a letter to the Planning Board, dated April 16, 2013, arguing that the denial of the

Town's application to stay the Planning Board's consideration of S&R's site plan and the Appellate Division's *sua sponte* dismissal of the Town's appeal "can only mean" that S&R's Property was now located in the R-20 single-family zone and that the Second Department had somehow signaled its intention to reverse Justice Loehr's *S&R v. Feiner I Order* and to uphold the Town Board's re-zoning of the Property to R-20. Bernstein desperately argued that even though the Appellate Division refused to stay the Planning Board's legal obligation to review S&R's site plan, the Planning Board had the authority to unilaterally suspend its review.

168.   S&R responded in a letter from its counsel to the Planning Board dated April 17, 2013. S&R pointed out the absurdity of the position taken by Mr. Bernstein and the ECC. Bernstein replied to this letter the same day, again arguing nonsensically that the Appellate Division could not have dismissed the Town's appeal unless it had determined the Town's re-zoning of the Property in September 2012 was legal. The Planning Board also received a letter from the GNC, which repeated Mr. Bernstein's frivolous analysis.

169.   Nonetheless, succumbing to intense pressure by Supervisor Feiner, Councilman Sheehan, and Planning Board member Golden, the Planning Board adopted this baseless and tortured interpretation of the Appellate Division's denial of the Town's two stay applications. In other words, the Planning Board accepted the argument made by Mr. Bernstein of the ECC and adopted the position that the Appellate Division's denial of the Town's two applications to stay Justice Loehr's rulings somehow reversed those same rulings.

170.   On April 17, 2013, notwithstanding the absence of any stay, the Planning Board adjourned indefinitely the scheduled continued public hearing on S&R's application for site plan approval finding that the zoning of the Property is "not free from doubt." Defendants effectively issued their own stay, defying multiple court orders and refused to process S&R's application for site plan approval until the Appellate Division issued an order "clarifying" the

zoning of the Property (notwithstanding the fact that *S&R v. Feiner I* and *Ross* both held that the Property was zoned CA).

171. S&R, by letter from its counsel dated April 24, 2013, demanded that the Planning Board restore the S&R site plan to the Planning Board's calendar for its May 15, 2013 meeting and to continue the public hearing on S&R's site plan. At its meeting on May 1, 2013, the Planning Board denied S&R's request (a) to restore S&R's site plan to the calendar for the May 15, 2013 Planning Board meeting and (b) to continue its review of S&R's site plan. When S&R's engineer requested an explanation of the Planning Board's decision, the Deputy Town Attorney stated that "There's no official—there's no written decision…. You can consult with our outside counsel if you wish."

172. On May 15, 2013, S&R was forced to commence yet another, and otherwise unnecessary and avoidable, Article 78 proceeding against the Planning Board (*Matter of S&R Development Estates v. Frances McLaughlin, et. al.*, Index No. 2347/13) to compel the Planning Board to perform its legal duty to continue its review of S&R's site plan given that the Planning Board's *sua sponte* extrajudicial stay violated five separate Court orders. In addition, S&R argued that the Planning Board's decision to adjourn indefinitely the scheduled continued public hearing on S&R's application for site plan approval was arbitrary, capricious, and affected by error of law for the same reasons and because the Planning Board was required by Section 285-57 of the Town Code to continue review of S&R's site plan.

173. The Planning Board opposed this Article 78 proceeding and defended its refusal to continue reviewing S&R's site plan by arguing that Justice Loehr's ruling in Ross, that the September 2012 zoning amendments "were inapplicable" to S&R, "did not necessarily abrogate" the Town Board's re-zoning of the Property and that a Planning Board is not obligated to conclude a public hearing, which would trigger the obligation to vote on the site

plan. Thus, the Planning Board argued that since a Planning Board is not required to conclude a public hearing it must have the inherent power to delay indefinitely the date when it will rule on the application.

174.   On August 13, 2013, the court (Cacace, J.) ruled in the *S&R v. Feiner II* case that Defendants' re-zoning of the Property violated S&R's rights under *S&R v. Feiner I* and that the Town had acted in bad faith in re-zoning the Property. *See S&R Development Estates LLC v. Feiner*, Index No. 1099-13 (N.Y. Sup. Ct. Westchester Cty. Aug. 13, 2013) (the "*S&R v. Feiner II Order*"). The court ordered the Town to approve S&R's site plan subject to reasonable conditions, stating that "respondents are directed to consider and grant the petitioner's application for site plan approval subject to legitimate technical compliance with applicable building codes and concerns." The court held that "it is apparent that the respondent's action[s] were a poorly veiled attempt to avoid the decision and order of this court of January 10, 2012. The court finds the actions of the respondents to be arbitrary and capricious and in bad faith."

175.   Rather than comply with Judge Cacace's ruling, the Town, relying on the delay of the illegal Planning Board adjournment, quickly appealed. This appeal was used by the Planning Board to invoke another stay, allowing it to continue postponing approval of S&R's site plan.

## M.   Defendants Conspire to Continue Violating Plaintiffs' Rights by Exercising an Inapplicable Restrictive Covenant

176.   Following dismissal of the *Ross* Proceeding, the ECC turned to a new strategy to block the Development. With Mr. Bernstein's assistance, the ECC conspired with the Sisters of the Blessed Sacrament in threatening enforcement of a restrictive covenant to block the Development. Specifically, the original deed conveying the Property contained a covenant prohibiting the erection of a "tenement or flat house so called" on the Property (the "Restrictive

Covenant"). Defendants assert that the restrictive covenant bars S&R from constructing the Development.

177. At an ECC meeting on March 4, 2013, then-ECC President Loftus, announced that "Michelle McNally found restrictive covenants" on the Property, which could be enforced by the owners of a lot adjacent to the S&R Property and owned by the Sisters. Despite never previously having voiced opposition to S&R's plans during the prior six years, notwithstanding their receipt of multiple public notices, the Sisters were now integral to ECC's efforts to block the Development. The Sisters are represented *pro bono* by Mr. Bernstein with the ECC paying the out-of-pocket legal expenses from the Dromore Defense Fund (a fund set up specifically to block the Development). Upon information and belief, Mr. Bernstein and other members of the ECC and GNC encouraged and persuaded the Sisters to publicly threaten their intention to exercise the restrictive covenant against S&R.

178. Consistent with his previous opposition to the Development (on behalf of the ECC and residents of Scarsdale Woods), Mr. Bernstein publicly objected to the Development on behalf of the Sisters at various Town events, Town Board meetings, Planning Board meetings, in the local press, and on several other occasions.

179. S&R's counsel received a letter dated March 2, 2013 and signed by Sr. Mary Francis Blackmore, which stated that "We intend to enforce these restrictive covenants to the full extent of the law…. If your client persists in pursuing plans to develop the property at 62 Dromore Road in violation of the restrictive covenants thereon, we will have no choice but to bring legal action to obtain declaratory and injunctive relief to enforce our rights." Upon information and belief, Mr. Bernstein drafted and sent this letter.

180. The minutes from an ECC meeting held on May 6, 2013 record a threat from Mr. Bernstein that "the Sisters of the Holy Sacrament would file their own legal proceeding to

enforce a restrictive covenant barring the construction of multi-family housing units on the property no matter what the zoning code may permit."

181. Because of this legal posturing by Defendants, S&R was forced to commence another action in Supreme Court, Westchester County, entitled *S&R Development Estates, LLC v. Town of Greenburgh, et. al.*, Index No. 60912/2013 (the "*Restrictive Covenant Litigation I*"). The action named as Defendants all property owners comprising the lots of the century old original subdivision of which the Property was a part, including the Town, the Sisters, Dilstan Realty Corporation, 500 Central Scarsdale Woods, Inc., Board of Managers of Scarsdale Woods Condominium, and Board of Education of the Edgemont Union Free School District No. 6. The complaint sought a declaration that the Restrictive Covenant, which prohibited the construction of "a tenement or flat house so called," did not prohibit the construction of S&R's proposed modern multi-family housing development and that the Restrictive Covenant was no longer enforceable due to changed circumstances in the vicinity. The Sisters moved to dismiss the complaint.

182. The Town, which owns the adjoining GNC property, was in no position to support enforcement of the Restrictive Covenant given that the same covenant also prohibited the operation of any business and the sale of alcohol at the GNC property; GNC's business operations continuously violated both of those conditions—neither of which the Sisters have ever sought to enforce.

183. Dilstan Realty Corporation consented to the relief requested by S&R in its complaint and likewise sought a judgment declaring the Restrictive Covenant unenforceable. The Edgemont School District took no position of enforcement of the Restrictive Covenant. The School District issued a statement:

> Questions of land use are within the jurisdiction of the Town of Greenburgh, which is the body authorized by law to deal with development and

construction, and it is up to the Edgemont Community Council (ECC) to represent Edgemont to the Town of Greenburgh on such issues. It is the School District's present intention to let the Town address the issues presented by this case, as those involve the Town's authority and particular expertise.

184.     In a letter to *The Scarsdale Inquirer*, Mr. Bernstein of the ECC acknowledged the School District's long-standing policy of abstention in land use and zoning issues:

The Edgemont School Board has had a longstanding policy that it does not take positions on matters pending before the Town of Greenburgh. Instead it refers all such matters to the Edgemont Community Council, which speaks for Edgemont in such matters … The Edgemont School Board is not a political body and, consistent with that self-imposed mandate, which we believe has allowed Edgemont to achieve enormous success, it makes policy decisions only on matters directly affecting the education of children in the district.

185.     By Decision and Order dated February 7, 2014, the Supreme Court, Westchester County (Bellantoni, J.) granted the motion to dismiss, without prejudice, holding that the Restrictive Covenant was not ripe for judicial consideration. The court stated that "[t]he dispute concerning the restrictive covenant will only ripen into an actual dispute once one or more appellate decisions are resolved in plaintiffs' favor at some unknown point in the future and only after further action is taken on plaintiffs' application for site plan approval, which is currently being held in abeyance. Consequently, plaintiffs' complaint does not present a justiciable controversy upon which the Court may properly render a declaratory judgment."

186.     Shortly before this decision, on December 26, 2013, the Appellate Division, Second Department, affirmed Justice Loehr's decision in *S&R v. Feiner I*. Nonetheless, the Planning Board refused to review S&R's site plan, pointing to the automatic stay of the *S&R v. Feiner II* pending the outcome of that appeal. On October 14, 2015, the Appellate Division, Second Department, affirmed Justice Cacace's decision in *S&R v. Feiner II*.

187.     The Edgemont community became enraged by the Appellate Division's sweeping rejection of their efforts to block the Development. A lengthy ECC website post, still refusing to accept the Property's legal zoning designation, described the next step in their strategy to

block S&R's affordable housing plan. The web post explained that the Sisters would continue to attempt to enforce the Restrictive Covenant and that Mr. Bernstein would be representing them *pro bono*, but the ECC would pay his expenses.

188.    Later on October 14, 2015, during a regularly scheduled Town Board meeting, some residents asked how the Town would respond to the Appellate Division decision affirming *S&R v. Feiner II*. Supervisor Feiner told the audience that he "tried to protect the GNC and the (Edgemont) School District."

189.    An ECC website post the following day summarized the reasons for the ECC's longstanding opposition to S&R's affordable housing plan reflecting their discriminatory intent:

> Edgemont residents were concerned that expanding the area on Central Avenue where multi-family housing may be built would upset the balance which allows Edgemont to serve its diverse population, provide a first-rate education and remain economically sustainable.

190.    On December 2, 2015, the Planning Board held its final public hearing on S&R's site plan. Chairwoman McClaughlin noted "I can see that there are quite a few people who would like to speak." Mr. Bernstein of the ECC spoke on behalf of the Sisters requesting that the Planning Board require as a condition of site plan approval that no trees be removed from the Property until *Restrictive Covenant Litigation I* is concluded.

191.    At its January 6, 2016 meeting, the Planning Board approved S&R's site plan. That was ***almost two and a half years*** after being ordered to do so by Justice Cacace in *S&R v. Feiner II*, ***four years*** after Justice Loehr held that the ZBA changed S&R's zoning in bad faith, and ***nine years*** after S&R first submitted a site plan for multi-family housing.

192.    Before the vote, Planning Board member Golden openly expressed his hostility toward S&R's site plan, stating that the plan was "terrible" and that he "hopes it will never be built." He also struck two findings from the site plan approval resolution drafted by the DCDC

that "the proposed action is consistent with the surrounding area" (it was "absolutely not" Golden said) and "is an overall enhancement to the site and general area" ("because it is not" Golden said). Upon information and belief, Golden removed these findings in an effort to facilitate another future judicial challenge to S&R's site plan and to further delay and harass S&R.

193.   Upon information and belief, members of the ECC and the Board of Education asked Planning Board member Golden to delete those findings from the site plan approval resolution.

194.   In a lengthy website post on January 6, 2016, the ECC applauded Planning Board member Golden's efforts in deleting positive findings in the Planning Board resolution. The ECC then articulated its motives in supporting the Sisters in attempting to enforce the Restrictive Covenant: "Generally speaking, no lender is likely to fund construction of the project if it appears the property is subject to a restrictive covenant which bars the very construction to be funded."

**N.**     **Defendants Continue to Interpose Obstacles to Block the Development**

195.   Although S&R finally obtained site plan approval from the Town on January 6, 2016, the Development remains blocked as Defendants continue to litigate, to raise new permitting objections, and otherwise to prevent progress on S&R's plan to develop affordable housing. In particular, the ECC is working in concert with the School District and with the Sisters to block the affordable housing project.

196.   Because the Sisters and Mr. Bernstein continue to threaten to block development based on the Restrictive Covenant, on March 4, 2016, following resolution of all judicial appeals in its favor and the Planning Board's much belated grant of site plan approval for the Development, S&R had no choice but to commence another action in Supreme Court,

Westchester County, *S&R Development Estates, LLC v. Town of Greenburgh, et. al.*, Index No. 52747/2016 ("*Restrictive Covenant Litigation II*"). Once again, the complaint seeks a declaration that the Restrictive Covenant does not prohibit the construction of S&R's proposed Development and is no longer enforceable due to, *inter alia*, the conduct of neighboring lot owners and changed circumstances in the vicinity.

197. The Sisters, again represented *pro bono* by Mr. Bernstein of the ECC, again brought a pre-answer motion to dismiss the complaint. In support of the motion, Bernstein submitted an affidavit from the prior litigation, dated August 23, 2013, from Sr. Mary Frances Blackmore, which states in relevant part:

> When we purchased the property, it was important to us and to our mission that our property and the surrounding property remain pretty much as it is today.…
>
> We thus knew, for example that the properties were all subject to restrictive covenants that protected our property and the surrounding properties from being developed with anything other than single family homes. These covenants were critically important to our decision to purchase. While we knew there was a chance that one or two single family homes could be built on the property immediately facing us which is now owned by plaintiff [S&R], we never thought that an apartment building could ever be built there. Indeed, we would never have purchased the property if we even thought that was even a possibility.

198. The statements contained in the Sr. Blackmore affidavit contradict her earlier letter to the Planning Board dated January 19, 2013, in which she made no mention of any restrictive covenants. In her letter, Sr. Blackmore referenced concerns regarding access of fire equipment to the property and the GNC's desire for green space. The statements contained in Sr. Blackmore's affidavit, which was the primary basis upon which Bernstein requested pre-answer dismissal of *Restrictive Covenant Litigation II*, were also inconsistent with statements made by Mr. Bernstein of the ECC at public hearings on S&R's site plan. At the February 6, 2013 public hearing, for example, the Sisters' real-estate attorney, Mr. Doran, who had

represented the Sisters in the purchase of their property, stated that the Sisters supported the arguments made by the GNC, which did not include any discussion of the Restrictive Covenant. Moreover, Attorney Doran made no mention of any restrictive covenants. Similarly, Sr. Blackmore did not reference any restrictive covenants in an interview on February 8, 2013 with the *Scarsdale Inquirer*. Finally, at the March 20, 2013 public hearing, Bernstein stated that the Sisters first "learned about the [Restrictive Covenant] coming to this public hearing the last time when they heard about it."

199.   On April 8, 2016, despite its long-standing policy of avoiding involvement in land-use and zoning issues, the School District joined in the Sisters' motion to dismiss the action to prevent enforcement of the Restrictive Covenant.

200.   Upon information and belief, the School District has never before formally opposed the construction of multi-family housing in the Edgemont section of the Town, nor has the School District previously joined in a lawsuit to prevent the construction of multi-family housing in the Edgemont section of the Town.

201.   Upon information and belief, Mr. Bernstein and other members of the ECC have conspired with the School District to become involved in the action regarding the Restrictive Covenant and have brought a pre-answer motion to dismiss for the purpose of further delaying construction. S&R has opposed the motion to dismiss and filed a cross-motion for partial summary judgment on its claims. Those motions are pending.

202.   If the Restrictive Covenant is deemed enforceable, then S&R may be forced to alter its site plan to avoid the proscriptions imposed by the Restrictive Covenant. This would cause further delay and damages and result in the continued blocking of affordable housing in Edgemont.

203. Defendants are currently engaged in numerous other efforts to thwart the Development. For example, the Town has adopted a Comprehensive Plan, which is a policy document intended to govern land-use decisions throughout the Town. The Comprehensive Plan is the blueprint for future development of the Town and has been termed its "bible."

204. The CPSC is the Town agency responsible for preparation of the Comprehensive Plan. On March 14, 2007, shortly after the Stellato Determination, the Town Board created the CPSC to create a new Comprehensive Plan for the unincorporated areas of the Town.

205. The first draft of the proposed Comprehensive Plan, released on March 21, 2014, included "nodes," or small concentrated areas along Central Avenue in which the construction of multi-family housing would be encouraged. Preiser and O'Shea, together with the ECC, were critical of the "nodes" concept in general and to any encouragement of multi-family housing within the Edgemont School District in particular. Subsequently, the ECC posted that "Alarmed Edgemont residents came out in droves to protest the proposal and the committee agreed to kill it."

206. During the public hearings on the Comprehensive Plan, the ECC organized substantial opposition to the original "nodes" concept. Edgemont residents packed the Town Hall and numerous individuals expressed concerns about the impact that multi-family and affordable housing would have on their community. For example:

   a) In a webpost, the ECC commented: "Edgemont residents expressed concern that the adoption of the plan with its potential for hundreds of new apartments would impose huge financial obligations on the school district in which one-third of all housing in the district already consists of multifamily housing units";

   b) Edgemont resident Hillary Greenberg, an ECC Director, spoke out against apartments since "Edgemont's taxes are going to go through the roof because ***we're now going to have to pay for the apartment kids coming to our school***" (emphasis added);

c) Edgemont resident Jaqueline Will spoke at the hearing stating that there "will be more residents coming by the multi-complex apartments so *that will be a huge impact for the budget for education and excellency of the current standards*";

d) Edgemont resident Tom Black spoke at the hearing: "I am very concerned for the schools … to be put in a position because of this comprehensive plan creating an environment where *the blueprint will rip at the fabric of Edgemont and ruin what is one of the town jewels and one of the great places to live* is just a very scary thought to me";

e) Edgemont resident Chang Wong spoke at great length about the high property values in Edgemont and the decline in values that will result if apartments are built on Central Avenue "Because the minute it starts losing and it's a domino effect. It always happens. It happens going up, it will happen going down. And once it starts going down you can't stop it … Edgemont doesn't have industries, doesn't have huge office buildings or whatever. It's just the school. That's it. You kill that, you kill Edgemont;"

f) Mr. Wong continued to elaborate on the Edgemont Community's sentiments: "I think the community itself is willing to pay higher taxes. *What they don't want is free riders.* They don't want the free rider problem where they are paying high taxes which they are paying now and will be in the future. *However, other people who are not paying the high taxes are coming and taking advantage of it. They end up paying for other children who are not paying the same proportional taxes.*";

g) Councilman Sheehan attempted to explain to the Edgemont residents that the Town had been threatened with a lawsuit if it prohibited new apartments on Central Avenue. He told the crowd that Mr. Bernstein of the ECC advised Supervisor Feiner how to respond to the threatened litigation and that Bernstein provided language to assist in the response;

h) Edgemont resident Amal Flatow questioned the benefits of multi-family housing in Edgemont: "My question to you is, what is the benefit and why would we propose new multi family housing that could destroy our school system, or certainly greatly damage it?";

i) Howard Hirsch, Vice President of the Edgemont Incorporation Committee, former ECC Board Member, and former Chairman of the ECC's School Board Nominating Committee, stated that the Comprehensive Plan "would encourage the development of apartments via proposed nodes and any such development would have a significant impact to our School District";

j) Edgemont resident and Director of the Fort Hill Civic Association (which operates under the auspices of the ECC), Nilesh Patel articulated his opinion that he wanted the Comprehensive Plan "*to eliminate all future multi-family … the densification only hurts the schools … no more multi-family in Edgemont*";

k)  Edgemont resident David Siegal lamented the possibility of new multi-family housing in Edgemont: "***You dump a whole lot of multi-family housing in Edgemont and you will destroy this school the way PS199 was destroyed***";

l)  Ms. McNally of the ECC added that she did not want more multi-family housing in Edgemont: "***And so when you talk about adding more apartments, you have to look at what this is going to cost in terms of educating…. now, maybe there is another section of town where having some apartments would be a good thing***….";

m) Edgemont resident Dennis Yang stated that "***the Edgemont community is against multi-family housing almost unanimously. For the reasons that it was going to stress the school***….'"";

n)  Bernstein questioned whether the Edgemont community could survive if additional multi-family housing is built in Edgemont: "But what needs to be understood here is that this comprehensive plan ... is existence-threatening to Edgemont. That is why almost everyone who came out to fill this room twice objects to this plan. It is existence-threatening….When you have an existential threat you will have people understandably angry and upset";

o)  Edgemont resident Nancy Ellis added that "Edgemont school district is bursting at the seams. We cannot have any more students. We just can't afford it. Then our empty nesters leave and it is an additional tax burden on all of the residents";

p)  Longtime Edgemont resident and ECC Director, Peter Mellis, stated that the Comprehensive Plan "does not deal with the impact on the school district" and that ***Edgemont may turn into "Queens Boulevard or part of the Bronx or whatever it is we tried to escape when we moved to Greenburgh***";

q)  Edgemont resident Mark Rosenblatt summed up the feelings of many Edgemont residents when he said "***Every kid from every apartment is effectively subsidized by single family residences***. If we add many more apartments those all have to be subsidized by the limited number of single family homes. The single family homes will carry the burden of those taxes which are underpaid by apartments";

r)  Edgemont resident and former Edgemont Board of Education President Sarah Stern stated: "It gets more difficult when you have a higher percentage of apartment dwellers to residential dwellers … What I worry about if we stop having such an excellent school district because we are not able to afford to educate the kids the way we are now";

s)  At an early public hearing in 2014, Edgemont resident Alan Fishman spoke out forcefully against new multi-family construction: "***A good amount of those higher school taxes are skewed against us as you are aware because of the substantially lower taxes paid by all of those apartment dwellers on Central Avenue that got the same education as our kids. Thus, we are actually subsidizing the terrific education of the children living in those apartments ... dwellers on Central Avenue that got the same education as our kids ….*** Unfortunately, all of those additional apartments you people have

so callously suggest be built will have to be subsidized by us on top of everything else we are paying for. ***The high quality education we have protected all of these many decades and the value of our homes will suffer***…. Or we can spend substantially higher taxes subsidizing your new students"; and

t) Edgemont resident Evan Tyler stated: "***I grew up in Rockland and they put in low cost housing, when my brother went to school there were Fulbright Scholars and when I got out of high school there were guns and metal detectors***."

207.   The second draft of the Comprehensive Plan, released on March 24, 2015, was revised in response to these comments from the Edgemont community to delete the "nodes" concept. Ignoring S&R's demand, the Zoning Map and Future Land Use Map continued to indicate that the Property was zoned R-20 and that the proposed future use was single-family residential. The expressed purposes are to prevent construction of affordable multi-family housing developments and to prevent the future residents of such housing from attending Edgemont schools.

208.   Supervisor Feiner has expressed his desire to eliminate multi-family housing from the CA Zone and therefore eliminate all future multi-family housing from the Edgemont School District. Councilman Sheehan echoed this sentiment but stated that it was difficult for the CPSC to make that change in light of the fact that there was ongoing litigation surrounding the CA Zone.

209.   On February 3, 2016, the Planning Board met to review the Comprehensive Plan. The transcript of those proceedings makes clear that the Town is focused on finding a way to obstruct the development of multi-family housing along Central Avenue. For example:

a) Planning Board Member Hugh Schwartz stated that "there are certain particular pieces of property on Central Avenue, and I can identify a few of them, that under the current zoning law could become residential which would not be good for either the Town or the school district."

b) Mr. Schwartz also stated that "the way to think about flexibility is to think about the fact there is, unfortunately, a somewhat -- slight conflict of interest, more than a slight conflict of interest between the interests of the school

district and the interests of the Town.... You know, whether it's residential or commercial, the Town still gets money. The school district, it's a different issue to them, even though they can't technically admit it because they need to -- by law they are required to support whoever is there. They can't say that."

c) Chairperson McLaughlin stated "we took the multi-family off of the rest of Central Avenue, for instance, in case a shopping mall went belly up there would be no multi family."

d) Planning Board Member Michael Golden spoke about multi-family housing along Central Avenue: "that whole firestorm was caused because people were concerned about the multi-family housing would bring in a lot of kids, which they do. That's why people move into that housing on Central Avenue so they can go to the schools. But if you can do multi-family housing and just zone it for just old people, then that solves a problem."

210.    The ECC posted on its website that it intended to influence the CPSC and encouraged Edgemont "to pack Town Hall with angry residents to back us up…. We need a local government that not only protects our quality of life, but one that also works hand in glove with our school district to preserve and protect the value of an Edgemont education."

211.    On March 16, 2016, the Planning Board continued to review the Comprehensive Plan. The Planning Board discussed creating a "pilot" area with retail and residential development combined. Planning Board member Desai, fully aware of the ECC's opposition to additional multi-family residential in Edgemont, stated, "I think considering the political climate, you may not want to say on Central Avenue." Planning Board member Schwartz stated that mixed-use development should be allowed "so long as it doesn't have a negative impact on the schools…." Planning Board member Golden, regarding multi-family development, stated, "You know, there has to be criteria, I understand, but it should be very strict and the Board should be given wide latitude not to approve the project."

212.    The Town's Official Zoning Map continues to depict the Property as being in the R-20 Zone, instead of the CA Zone. S&R made repeated requests, for example, by letter dated April 24, 2015, to Chair Francis Sheehan and Members of the CPSC to correct the

Comprehensive Plan Maps and the Town's Official Zoning Map, advising that the proposed plan was in violation of four court orders.

213.  On September 28, 2016, prior to a meeting of the Town Board on the Comprehensive Plan, Richard Troy e-mailed the Town Board members and the members of the Comprehensive Plan Steering Committee, advising them that the Draft Comprehensive Plan's depiction of the Property as zoned R-20 was in violation of court orders and further demonstrated the Town's bad faith. The e-mail repeated S&R's demand that the Town correct all maps to show that the zoning of the Property is CA. The Town Attorney and Planning Commissioner responded with a telephone call acknowledging the request and the fact that S&R may bring another suit if the Plan was approved "as is."

214.  Nonetheless, on September 28, 2016, the Town adopted the Comprehensive Plan with the Official Zoning Map along with planning maps showing the Property in the R-20 Zone, instead of the CA Zone. Moreover, Appendix E of the Comprehensive Plan details numerous proposed future zoning changes to the Town's Official Zoning Map. Despite repeated requests, however, the Property is not even listed among those parcels scheduled for future amended zoning. The Comprehensive Plan as adopted reflects the Town's continued opposition to multi-family housing within the boundaries of the Edgemont School District by proposing a special-permit criteria for the development of multi-family housing along Central Avenue, the only multi-family zoning district in the Edgemont School District and by limiting the sites available for multi-family housing.

215.  The Comprehensive Plan fails to consider the regional need for affordable housing in the Central Westchester County region.

216.  The Town Board also failed to satisfy relevant regulatory requirements in adopting the Comprehensive Plan, which is a Type I Action under SEQRA and is therefore

more likely to require the preparation of an Environmental Impact Statement. Instead, the Town Board issued a Negative Declaration pursuant to SEQRA but failed to explain the basis for its decision.

217. The failure to prepare a Draft Environmental Impact Statement, the failure to consider regional needs for affordable housing, the failure to take a hard look at the environmental issues and the failure to make a reasoned elaboration of the basis of its decision was arbitrary and capricious, an abuse of discretion, affected by error of law, and done in violation of lawful procedure.

*Additional Current Obstacles to the Development*

218. In addition to the Comprehensive Plan and *Restrictive Covenant Litigation II*, S&R continues to face a number of obstacles to completion of the Development:

219. First, S&R presently has pending before the Town an application for a permit to construct a sidewalk as required by the Planning Board's site plan approval resolution. While site plan approval is delayed, S&R cannot make progress on the Development. On information and belief, the Town is delaying approval of the street opening permit in order to block the Development. For example, S&R's engineer had to wait three months just to receive authorization to proceed with the routine filing of a street opening permit for the required sidewalk.

220. Second, upon information and belief, Edgemont community members, including a former officer of the ECC and member of the Edgemont School Board, approached the Fire Chief to pressure him to create doubt about the safety of Dromore Road and the Fire Department's ability to gain access to the Development. For example, when the Development was before the Planning Board in 2012, residents pressured the Fire Commissioner to manufacture questions regarding the safety of the road leading to the Development.

221.   During oral argument in *S&R v. Feiner II*, the Appellate Division, Second Department, commented on the Town's purported safety concerns about Dromore Road being too narrow and winding to support multi-family housing. According to a web posting by Mr. Bernstein, the court found the road concerns to be pretextual: "So persuaded was the court that the Town had acted improperly that one of the judges at last month's oral argument even doubted that the Town had legitimate concerns about Dromore Road being too narrow and winding a road to support a multifamily housing project -- essentially agreeing with S&R that the real reason was resistance to affordable multifamily housing generally."

222.   Third, as another condition of site plan approval, S&R is required to obtain a tree-removal permit, which expires on January 7, 2017. But S&R has been deterred from seeking the permit by the ECC's threat, made through Mr. Bernstein, threatening that the Sisters would seek a TRO.

223.   Fourth, S&R plans to apply for state and federal funding, in which case it will need certain approvals from the Town. Given Defendants' campaign to block the Development, S&R has been deterred from seeking these approvals without a court order requiring the Town to issue such approvals.

224.   Fifth, S&R has made repeated requests for the Town, through the Town Attorney, Deputy Town Attorney, and Planning Commissioner, and Deputy Planning Commissioner, to amend the Official Town Zoning Map to correctly reflect the zoning of the Property as CA rather than R-20. With no explanation, the Town has ignored these requests since 2015. The persistence of this deliberate mislabeling on the Official Town Map has harmed S&R, for example, by impeding its ability to obtain a mortgage on the property. At the latest, the Town should have amended the Map immediately following the Appellate Division's decision on October 14, 2015. Moreover, despite repeated requests to the Planning Commissioner and

Deputy Planning Commissioner, the CPSC has not modified its many planning maps to correctly reflect the zoning of the Property as CA rather than R-20.

225.   Defendants' refusal to correct the zoning designation of the Property is causing ongoing harm to S&R because it indicates to potential lenders, joint venture partners, and buyers of the Property that the Town continues to oppose the Development and because it requires S&R to continue expending resources to seek relief from Defendants' misconduct.

226.   Sixth, four months ago, the Town published results of a Town-wide revaluation of real property. The tax assessor has valued the property as an R-20 property, which is incorrect, and is overvaluing the property relative to comparable properties. This is not the first time that the tax assessor has incorrectly designated the Property. In 2007, the Town refused to recognize the fact that S&R had demolished the home on the Property in 2006 and, as a result, imposed taxes at a much higher rate than the vacant land rate. Both times, S&R has been forced to engage tax certiorari counsel.

227.   Seventh, Planning Board member Schwartz has recently publicly called for a building moratorium, only on Central Avenue, the zoning district of the Property. Such a moratorium could further delay construction. The last construction moratorium in the Town of Greenburgh lasted three years.

228.   Eighth, there is an ongoing effort by Edgemont to incorporate as a separate village, which would enable it to rezone areas located within Edgemont in order to prevent the development of affordable multi-family housing, including the Property (albeit for improper reasons and in contravention of the FHA). The incorporation of Edgemont would dramatically reduce the tax base of the Town. Edgemont has the Town's most expensive homes and accordingly pays a relatively larger share of taxes. Edgemont's taxes owed to Greenburgh would be cut by more than 90% if it becomes a separate village. This would force the Town to

eliminate or sharply reduce many of its services and programs, to the detriment of the other unincorporated sections of Greenburgh.

229. Mr. Bernstein of the ECC is one of three incorporators trying to bring a referendum and to turn Edgemont into its own village with signatures currently being gathered. If Edgemont becomes a separate village, then its leadership would almost certainly attempt to change the zoning of the Property to a much lower-density zone. The impetus for incorporation is the same improper and discriminatory motivation that has led Defendants to block the Development. For example, the driving force behind the incorporation effort, the Edgemont Incorporation Committee, has stated their belief that incorporating and forming their own village, distinct from the Town of Greenburgh, "*is vital to protecting our school district and shared values*." The same group lists on their website as a top priority to "empower" Edgemont "to manage zoning/planning related matters that impact the community and school quality, student body size and budgets." Without the Court's intervention, the planned incorporation of Edgemont will likely be the next stage of Defendants' ongoing efforts to violate Plaintiffs' rights.

230. In sum, because the tree removal permit approval is valid for one year and the site plan approval is valid for two years, S&R may need an extension in light of the numerous pending issues. Absent injunctive relief, S&R believes that Defendants will continue to block and delay progress on the Development by acting in bad faith on the issues described above.

231. The Town has a history of using delay as a tactic in blocking lawful projects. *See, e.g.*, *Crown Castle NG East Inc. v. Town of Greenburgh*, No. 12-6157 (S.D.N.Y. July 3, 2013) ("The Town has proffered no real explanation as to why its process took so long … the bureaucratic hoops through which Plaintiff was put, along with the rest of the record, suggest that the Town would be no more interested in a prompt disposition now than it was beginning

in 2009…. Accordingly, the appropriate remedy in equity is an order requiring the issuance of the special permits sought."). Commenting on the *Crown Castle NG East* decision and reflecting on the *Fortress Bible Church* decision, in an editorial, the *Scarsdale Inquirer* stated on July 26, 2013 that "There's a common theme to all these cases, and that is Feiner's habit of placing the concerns of vocal minorities above the good of the town as a whole and even above the law. Whether it's political cronies or an outspoken neighborhood group, Feiner tries to give them what they want (or prevent what they don't want, like an African-American church or a shelter for homeless mothers.)"

*Defendants treated S&R differently than comparable projects in other Town school districts*

232. Finally, by way of comparison, Defendants treated S&R differently than three other similarly-situated multi-family housing developments that were proposed in the Town during the period from 2007 through 2016.

233. First, Westhab, Inc. proposed to construct 28 units of workforce rental housing at 22 Tarrytown Road in the Fairview section of the Town, which feeds into Woodlands School District. In January 2008, at Westhab's request, the Town Board amended the Zoning Ordinance to permit a greater number of apartments than would otherwise have been permitted. The zoning change to increase the permitted density of the development, the amendment to the Zoning Ordinance to amend the definition of "Suitable Open Space" and the granting of a waiver were significant accommodations. In contrast, S&R applied for no zoning changes or variances.

234. Compared to the Development, Westhab proposed fewer parking spots per unit, less open space, and smaller apartments. The Town also projected that there would be additional school-age children residing in the Westhab development, but did not view that as an adverse impact on the Woodlands School District.

66

235. Following the Town Board's re-zoning, the Westhab site plan was submitted to the Planning Board on June 3, 2009 and was approved by a unanimous vote on October 21, 2009, less than five months later. The Town cited several studies recommending the development of affordable housing.

236. Second, Hartsdale Development, LLC proposed to construct 51 units of multi-family housing (known as The Esplanade) at 250 Central Avenue South in the Hartsdale section of the Town, which feeds into Woodlands Middle and High School.

237. The site plan proposal for the Esplanade was for 51 units and required accommodations for steep slopes and significant tree removals. Nonetheless, the proposal was submitted on June 18, 2008 and approved by unanimous vote on June 3, 2009, less than one year later.

238. Third, Avalon Green III, LLC proposed to construct 68 units of multi-family housing (known as Avalon Green III) at 500 Town Green Drive, Elmsford in the Elmsford section of the Town, which feeds into Alexander Hamilton Middle and High School.

239. On September 13, 2013, at Avalon Green III's request, the Town Board approved a special permit to increase the height of the proposed new building from three to four stories. Following the issuance of the special permit, the Avalon Green III site plan was submitted to the Planning Board on October 19, 2013 and was approved by a unanimous vote on January 19, 2014, less than five months later. The Town Board approved Avalon Green III's site plan approval and its special permit on March 12, 2014, less than seven months later.

240. Finally, the Town amended the zoning code to allow for assisted living facilities in residential neighborhoods to accommodate the development of Brightview Senior Housing, an assisted living facility for senior citizens. Importantly, senior housing developments will not have school age children.

241.   GNC Executive Director Goldberg has suggested that S&R build an assisted living development instead of affordable housing. This further demonstrates that opposition to the Development is motivated by a desire to prevent families with children and residents of affordable housing from moving into Edgemont.

**COUNT I**
**Violation of the Fair Housing Act—Disparate Treatment**
**(as against Defendants Town, Town Board, CPSC, DCDC,**
**Planning Board, ZBA, School District, and Board of Education)**

242.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 241 as if fully set forth herein.

243.   The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

244.   Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

245.   Defendants oppose the Development for discriminatory reasons, namely because multi-family affordable housing will attract families of diverse ethnicity and race and families with children who will attend the Edgemont School System. Defendants' conduct therefore has been and continues to be motivated by a discriminatory desire to prevent minorities, including African-American and Hispanic persons, persons from diverse socio-economic backgrounds, and families with children from moving into the Edgemont School District. As described above, most of the Town's affordable housing is concentrated in the Fairview section of Town, and the Edgemont School District is largely segregated.

246.   Defendants' discriminatory actions have made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

247.   Defendants' discriminatory actions have deprived S&R of its ability to build the Development and have effectively blocked the Development indefinitely.

248.   Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

249.   Defendants' discriminatory treatment of Plaintiffs in violation of the Fair Housing Act is the product of a longstanding practice or custom of intentionally blocking the Development and/or at least one of Defendants' employees was acting as a final policymaker in intentionally blocking the Development.

250.   Defendants have acted with malice and with reckless indifference to the federally protected rights of Plaintiffs and others.

## COUNT II
### Violation of the Fair Housing Act—Disparate Treatment
### (as against Defendants GNC and Sisters)

251.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 250 as if fully set forth herein.

252.   The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

253.   Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

254.   Defendants oppose the Development for discriminatory reasons, namely because multi-family affordable housing will attract families of diverse ethnicity and race and families with children who will attend the Edgemont School System. Defendants' conduct therefore has been and continues to be motivated by a discriminatory desire to prevent minorities, including

African-American and Hispanic persons, persons from diverse socio-economic backgrounds, and families with children from moving into the Edgemont School District. As described above, most of the Town's affordable housing is concentrated in the Fairview section of Town, and the Edgemont School District is largely segregated.

255.     Defendants' discriminatory actions have made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

256.     Defendants' discriminatory actions have deprived S&R of its ability to build the Development and have effectively blocked the Development indefinitely.

257.     Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

258.     Defendants' discriminatory treatment of Plaintiffs in violation of the Fair Housing Act is the product of a longstanding practice or custom of intentionally blocking the Development and/or at least one of Defendants' employees was acting as a final policymaker in intentionally blocking the Development.

259.     Defendants have acted with malice and with reckless indifference to the federally protected rights of Plaintiffs and others.

## COUNT III
### Violation of the Fair Housing Act—Disparate Treatment
### (as against Defendants Feiner and Sheehan)

260.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 259 as if fully set forth herein.

261. The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

262. Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

263. Defendants oppose the Development for discriminatory reasons, namely because multi-family affordable housing will attract families of diverse ethnicity and race and families with children who will attend the Edgemont School System. Defendants' conduct therefore has been and continues to be motivated by a discriminatory desire to prevent minorities, including African-American and Hispanic persons, persons from diverse socio-economic backgrounds, and families with children from moving into the Edgemont School District. As described above, most of the Town's affordable housing is concentrated in the Fairview section of Town, and the Edgemont School District is largely segregated.

264. Defendants' discriminatory actions have made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

265. Defendants' discriminatory actions have deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

266. Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

267. Defendants violated Plaintiffs' clearly established rights under the Fair Housing Act of which a reasonable person would have known.

268.   Defendants have acted with malice and with reckless indifference to the federally protected rights of Plaintiffs and others.

**Count IV**
**Violation of the Fair Housing Act—Disparate Impact**
**(as against Defendants Town, Town Board, CPSC, DCDC,**
**Planning Board, ZBA, School District, and Board of Education)**

269.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 268 as if fully set forth herein.

270.   Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

271.   The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

272.   Defendants' opposition to the Development has had a significantly adverse and disproportionate impact on minorities, including African-American and Hispanic persons, and families with children in that it has actually and predictably prevented families with children and minorities from moving into the Edgemont School District.

273.   Defendants' opposition to the Development has made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

274.   Defendants' opposition has deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

275.   Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

276.  Defendants' violation of the Fair Housing Act is the product of a longstanding practice or custom and/or at least one of Defendants' employees was acting as a final policymaker in violating the Fair Housing Act.

### Count V
### Violation of the Fair Housing Act—Disparate Impact
### (as against Defendants GNC and Sisters)

277.  Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 276 as if fully set forth herein.

278.  Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

279.  The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

280.  Defendants' opposition to the Development has had a significantly adverse and disproportionate impact on minorities, including African-American and Hispanic persons, and families with children in that it has actually and predictably prevented families with children and minorities from moving into the Edgemont School District.

281.  Defendants' opposition to the Development has made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

282.  Defendants' opposition has deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

283.  Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

284.   Defendants' violation of the Fair Housing Act is the product of a longstanding practice or custom and/or at least one of Defendants' employees was acting as a final policymaker in violating the Fair Housing Act.

**Count VI**
**Violation of the Fair Housing Act—Disparate Impact**
**(as against Defendants Feiner and Sheehan)**

285.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 284 as if fully set forth herein.

286.   Defendants are "persons" who may be sued under the Fair Housing Act pursuant to 42 U.S.C. § 3602(d).

287.   The Development will contain "dwellings," as defined by the Fair Housing Act, 42 U.S.C. § 3602(b), because they are "designed or intended for occupancy as, a residence by one or more families."

288.   Defendants' opposition to the Development has had a significantly adverse and disproportionate impact on minorities, including African-American and Hispanic persons, and families with children in that it has actually and predictably prevented families with children and minorities from moving into the Edgemont School District.

289.   Defendants' opposition to the Development has made unavailable and denied dwellings for African-American and Hispanic families, as well as families with children, in the Edgemont School District.

290.   Defendants' opposition has deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

291.   Plaintiffs are "aggrieved persons" as defined in the Fair Housing Act, 42 U.S.C. § 3602(i), because they have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

292. Defendants violated Plaintiffs' clearly established rights under the Fair Housing Act of which a reasonable person would have known.

## COUNT VII
### Violation of Section 1983—Equal Protection Clause
### (as against Defendants Town, Town Board, CPSC, DCDC, Planning Board, ZBA, School District, and Board of Education)

293. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 292 as if fully set forth herein.

294. Defendants have treated the Development differently from similarly situated developments in the Fairview and Hartsdale sections of Town.

295. Defendants' differential treatment is based on the impermissible consideration of preventing minorities and families with children from moving into the Edgemont section of town, as Defendants know that African-American and Hispanic persons, as well as families with children, will move into the Development once it is completed.

296. Defendants' illegal actions were taken under color of law.

297. Defendants' illegal actions has deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

298. Defendants' violation of the Equal Protection Clause is the product of a longstanding practice or custom and/or at least one of Defendants' employees was acting as a final policymaker in violating the Equal Protection Clause.

299. Defendants' conscious wrongful conduct is motivated by discriminatory intent and involves reckless and callous indifference to the federally protected rights of others.

## COUNT VIII
### Violation of Section 1983—Substantive Due Process
#### (as against Defendants Town, Town Board, CPSC, DCDC,
#### Planning Board, ZBA, School District, and Board of Education)

300. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 299 as if fully set forth herein.

301. S&R has a protected property interest in building the Development when it purchased the Property on May 14, 2006 because the Property was located within the CA Zone.

302. S&R obtained further protected property interests in building the Development when it incurred substantial expenses to develop the Property. Without the opportunity to build the Development, the subsequent expenses incurred in planning the Development have been rendered essentially valueless by Defendants' actions.

303. Defendants' actions blocking the Development have been arbitrary and irrational because they were motivated by a desire to prevent African-American and Hispanic persons, and families with children, from moving into the Edgemont School District.

304. Defendants' conduct in denying the permits has also been so outrageously arbitrary as to constitute a gross abuse of government power.

305. Defendants' violation of the Due Process Clause is the product of a longstanding practice or custom and/or at least one of Defendants' employees was acting as a final policymaker in violating the Due Process Clause.

306. Defendants' conscious wrongful conduct is motivated by malicious intent and involves reckless and callous indifference to the federally protected rights of others.

**COUNT IX**
**Violation of Section 1983—Procedural Due Process**
**(as against Defendants Town, Town Board, CPSC, DCDC,**
**Planning Board, ZBA, School District, and Board of Education)**

307.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 306 as if fully set forth herein.

308.   Plaintiffs had a protected property interest in building the Development when they purchased the Property on May 14, 2006 because it was located within the CA Zone.

309.   Plaintiffs obtained further protected property interests in building the Development when they incurred substantial expenses to develop the Property. Without the opportunity to build the Development, the subsequent expenses incurred in planning the Development have been rendered essentially valueless by Defendants' actions.

310.   Defendants' illegal conduct has deprived S&R of its ability to build the Development and effectively blocked the Development indefinitely.

311.   Defendants have acted without affording Plaintiffs adequate process under State law to remedy Defendants' conduct. Though S&R has obtained some relief in New York courts, Defendants have not been deterred and continue to find new, illegal, and unreviewable ways to block the Development. For example, Article 78 proceedings have proven inadequate because Defendants have defied the courts' orders in those proceedings, those proceedings have successfully delayed the Development, and Defendants have continued to delay the Development with impunity. The new proposed Comprehensive Plan and the Defendants' unilateral delay in issuing permits that are conditions that must be met for the Development to proceed are just two ways in which Defendants will continue to delay the Development.

312.   Defendants' violation of the Due Process Clause is the product of a longstanding practice or custom and/or at least one of Defendants' employees was acting as a final policymaker in violating the Due Process Clause.

313.   Defendants' conscious wrongful conduct is motivated by malicious intent and involves reckless and callous indifference to the federally protected rights of others.

**WHEREFORE**, Plaintiffs demand a judgment as follows:

1. Money damages of at least 26 million dollars ($26,000,000), in an amount to be proven at trial, for the loss of use of the Property, from February 26, 2007, and expenses incurred due to Defendants' unlawful conduct;

2. attorneys' fees pursuant to 42 U.S.C. § 3613 and 42 U.S.C. § 1988;

3. punitive damages;

4. a permanent injunction restraining Defendants from taking any action to: (i) prevent the construction of multi-family affordable housing on the Property, (ii) to prevent the construction of multi-family housing in the CA Zone within the Edgemont School District, (iii) to prevent the construction of additional affordable multi-family housing in the Edgemont section of the Town, and (iv) incorporate Edgemont as a separate village, which would enable it to rezone areas located within Edgemont;

5. a permanent injunction declaring the Comprehensive Plan null and void and of no further force and effect; and

6. such other and further relief that the Court deems just and proper, including statutory interest, costs and disbursements, and reasonable attorneys' fees.

## JURY DEMAND

Plaintiffs demand a jury trial for all claims stated herein.

Dated: White Plains, New York
      October 14, 2016

CONSOVOY MCCARTHY PARK PLLC

By:     */s/ Michael H. Park*
        Michael H. Park
        3 Columbus Cir., 15th Floor
        New York, NY 10024
        (212) 247-8006

BLEAKLEY PLATT & SCHMIDT, LLP
        William P. Harrington
        James W. Glatthaar
        One North Lexington Ave.
        P.O. Box 5056
        White Plains, NY 10602-5056
        (914) 949-2700

        *Attorneys for Plaintiffs*