UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
S&R DEVELOPMENT ESTATES, LLC, *et al.*,

                              Plaintiff,

                - against -

TOWN OF GREENBURGH, NEW YORK, *et al.*,

                            Defendants.       **OPINION AND ORDER**
-----------------------------------------------------------------------------x
SISTERS OF THE BLESSED SACRAMENT, INC.,       No. 16-CV-8043 (CS)

                      Counterclaim Plaintiff,

                - against -

S&R DEVELOPMENT ESTATES, LLC,

                      Counterclaim Defendant.
-----------------------------------------------------------------------------x

Appearances:
Robert B. Bernstein
Bernstein & Associates, PLLC
Scarsdale, New York
*Counsel for Counterclaim Plaintiff*

Michael H. Park
Consovoy McCarthy Park PLLC
New York, New York
*Counsel for Counterclaim Defendant*

William S. Consovoy
Bryan K. Weir
Consovoy McCarthy Park PLLC
Arlington, Virginia
*Counsel for Counterclaim Defendant*

William P. Harrington
James W. Glatthaar
Bleakley Platt & Schmidt, LLP
White Plains, New York
*Counsel for Counterclaim Defendant*

Seibel, J.

Before the Court is the motion of Plaintiff S&R Development Estates, LLC ("S&R") to dismiss the counterclaim of Defendant Sisters of the Blessed Sacrament, Inc. (the "Sisters"). (Doc. 140.) For the following reasons, the motion is GRANTED.

## I.   BACKGROUND

For purposes of this motion, I accept as true the facts, but not the conclusions, set forth in the Sisters' Amended Counterclaim. (Doc. 139 at 47-84 ("ACC").)[1]

### A.   Facts

Defendant and Counterclaim Plaintiff Sisters is a religious not-for-profit corporation that owns and operates a convent located at 86 Dromore Road in the Town of Greenburgh, New York. (*Id.* ¶ 19.) Plaintiff and Counterclaim Defendant S&R is a New York limited-liability company managed by brothers Stephen and Richard Troy. (*Id.*) In approximately 2006, S&R purchased, and since then has attempted to develop, a parcel of land directly adjacent to the Sisters' convent. (*Id.* ¶¶ 65, 95.)

The Sisters purchased the 6.7-acre lot which is used for their convent in 1996. (*Id.* ¶¶ 2, 26.) They use their land to "conduct daily prayer and meditation" and "spiritual reading and study." (*Id.* ¶ 25.) The Sisters allege that the parcel's relative distance from developed land is vital to their "need for quiet and privacy" and their religious practice. (*Id.* ¶ 29.)

The Sisters allege that certain restrictive covenants on the use of adjacent land were also important to their decision to purchase their land.[2] (*Id.* ¶ 43) The Sisters' land and all of the

---

[1] Many of the facts set forth in the ACC strike the Court as irrelevant to the claim and will not be summarized here.

[2] The largest adjacent property to the Sisters' land is located to the north and is occupied by the Greenburgh Nature Center, a group "preserving the property for passive recreation." (*Id.*) The Sisters' southern neighbor is the Edgemont School District, but the school is not visible from the Sisters' property and the properties are divided by a

adjacent parcels are part of a ten-lot subdivision that was created by a March 1912 deed.

(*Id.* ¶¶ 5, 37.)  The deed included restrictive covenants that banned, among other things, the

building of "tenements and flat houses so-called."  (*Id.* ¶¶ 26, 37.)  The Sisters argue that this

ban continues in force and restricts the building of any modern apartment building.  (*Id.* ¶ 110.)

Following its acquisition of the neighboring property, S&R received a permit to demolish

the then-existing home and swimming pool, and submitted plans to build thirty-seven "market

rate" apartments.  (*Id.* ¶ 67.)  On August 17, 2009, S&R publicly announced a new plan to build

forty-one "affordable housing" units instead.  (*Id.* ¶ 95.)

S&R and the Town were involved in multiple lawsuits as early as 2008 regarding

whether the zoning of its land allowed for the development of a housing project.  (*Id.* ¶ 94.)  In

March 2008, the Sisters notified the Town that they opposed any zoning change to S&R's

property that would interfere with the zoning classification that guaranteed their peaceful setting.

(*Id.* ¶¶ 92-93.)  During a Town Planning Board hearing held in February 2013 regarding S&R's

request for a zoning variance, the Edgemont Community Council, a local civic group, raised the

issue of the restrictive covenant, which brought it to the attention of the Sisters' counsel, who

was at the meeting.  (*Id.* ¶¶ 102, 103.)

On March 2, 2013, the Sisters sent a letter to S&R reserving its rights under the

restrictive covenant.  (*Id.* ¶ 106.)  Following receipt of this letter, S&R commenced a suit against

the Sisters in Westchester County Supreme Court seeking to extinguish the enforcement of the

covenant.  (*Id.* ¶ 107.)  After this suit was dismissed on procedural grounds, a second suit was

filed on March 4, 2016, and is currently pending.  (*Id.* ¶¶ 107-108.)

---

buffer of mature trees.  (*Id.* ¶ 30.)  The only other adjacent property is a 2.39-acre parcel which, prior to S&R's
acquisition, was the site of a single-family home with a swimming pool.  (*Id.* ¶ 31.)

## B.    Procedural History

On October 14, 2016, S&R commenced this action claiming, among other things, that the Sisters selectively enforced the covenant against it in violation of the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. §§ 3601 *et seq.*  (*See* Doc. 1.)  On February 17, 2017, S&R filed an Amended Complaint including the same claim against the Sisters.  (Doc. 78.)  The Sisters moved to dismiss, (Doc. 103), and in an oral ruling on September 20, 2017, the Court denied the motion, (Minute Entry dated Sept. 20, 2017).

On October 20, 2017, the Sisters filed an Answer to the Amended Complaint and Counterclaim.  (Doc. 129.)  On October 31, 2017, S&R filed a letter seeking a pre-motion conference to discuss its anticipated motion to dismiss the counterclaim.  (Doc. 133.)  The Sisters responded on November 8, 2017, (Doc. 136), and at a pre-motion conference on November 15, 2017, the Sisters were granted leave to amend their counterclaim.  (Minute Entry dated Nov. 15, 2017.)  On December 7, 2017, the Sisters filed an Amended Answer and Counterclaim.  (Doc. 139.)  On December 22, 2017, S&R filed the instant motion to dismiss the counterclaim.  (Doc. 140.)

In their counterclaim, the Sisters allege that in the event that S&R's FHA claims succeed, they should be entitled to compensation for any damages suffered as a result of the "extinguishment" of their restrictive covenant.  (ACC ¶¶ 122, 125.)  The Sisters' position is that New York Real Property Actions and Proceedings Law ("RPAPL") § 1951(2) allows for recovery of the monetary value of a covenant that has been deemed unenforceable, regardless of the reason.  *See* New York Real Prop. Acts. Law § 1951(2) (McKinney 2018); ACC ¶ 122.[3]

---

[3] RPAPL § 1951(2) authorizes a court in any action seeking relief against a restrictive covenant or a declaration with respect to its enforceability to cause its extinguishment "if the court shall find that the restriction is of no actual and substantial benefit to the persons seeking its enforcement or seeking a declaration or determination of its enforceability, either because the purpose of the restriction has already been accomplished or, by reason of changed

S&R responds that any state law claim for damages plainly conflicts with Congress's intent in passing the FHA and is therefore preempted. (Doc. 141 ("P's Mem.") at 4) ("It would be perverse to allow a state-law claim to require the victims of housing discrimination to compensate the perpetrators for the privilege of being their neighbors."). S&R also argues that the Sisters fail to state a claim under RPAPL § 1951(2). (*Id.* at 6 n.1.)

The Sisters respond that allowing the FHA to preempt § 1951(2) claims would amount to a "taking" without just compensation in violation of the Fifth Amendment. (Doc. 143 ("D's Opp.") at 13.) They allege further that in areas where state police powers have traditionally governed, there is a strong presumption against federal preemption and that the standard for showing preemption is rigorous.

II.     **LEGAL STANDARD**

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 397 (S.D.N.Y. 2018) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation

conditions or other cause, its purpose is not capable of accomplishment, or for any other reason" but requires payment to the party who would otherwise be entitled to enforcement of the covenant of "such damages . . . as such person or persons will sustain from the extinguishment of the restriction."

of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).[4]

A defense of preemption is properly considered on a motion to dismiss because all preemption claims are "conclusion[s] of law," and are therefore properly decided absent a full factual record. *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 672 (S.D.N.Y 2017). When taking all of the facts alleged in the complaint as true, "[a] district court may find a claim preempted only if the facts . . . do not plausibly give rise to a claim that is not preempted." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015).[5]

---

[4] The Sisters cite the outdated "any-set-of-facts" motion to dismiss standard. (D's Opp. at 2.) That standard was "retire[d]" by *Twombly* in 2007. *See Twombly*, 550 U.S. at 563. Nobody should be citing it in 2018.

[5] The Sisters attached multiple exhibits to their opposition papers. I need not decide if consideration of any of these exhibits is proper, *see Weiss v. Inc. Vill. Of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (describing what documents may be considered on a motion to dismiss), because I find none are relevant.

## III.  DISCUSSION

### A.  Legal Framework

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "From this constitutional principle, it follows that 'Congress has the power to preempt state law.'"  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 725 F.3d 65, 96 (2d Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).  It is well established that in every preemption case, "the purpose of Congress is the ultimate touchstone."  *Wyeth v. Levine*, 555 U.S. 555, 565, (2009) (internal quotation marks omitted).  There is a "presumption against preemption" in "areas of law traditionally reserved to the states, like police powers and property law," *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (internal quotation marks omitted), and it will only be overcome if "Congress has made such an intention clear and manifest," *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted); *see Wyeth*, 555 U.S. at 565.

There are several forms of preemption: when (1) "Congress expressly provides that a federal statute overrides state law"; (2) "Congress legislates so comprehensively in one area as to occupy the field"; or (3) "state law directly conflicts with the structure and purpose of a federal statute."  *MTBE,* 725 F.3d at 96-97 (internal quotation marks omitted).  With respect to the third category, a conflict has preemptive effect in only two instances—"first, when compliance with both federal and state regulations is a physical impossibility, and second, when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* at 97 (internal quotation marks omitted).

7

The party asserting that federal law preempts state law bears the burden of establishing preemption. *Wyeth*, 555 U.S. at 569. S&R relies on the second branch of conflict preemption – the obstacle analysis – to sustain its preemption argument, asserting that RPAPL § 1951(2) "stands as an obstacle" to achieving Congress's objectives in enacting the FHA. (P's Mem. at 5; *see id.* at 3-5 (arguing that the Sisters' Counterclaim "plainly conflicts with the FHA" and that "awarding the Sisters damages because of their own discrimination would plainly erode what Congress created in the FHA") (internal quotation marks and alterations omitted).) Whether a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects," *MTBE*, 725 F.3d at 101 (internal quotations omitted).

If the "implied manifestations of congressional intent," evince an "irreconcilable conflict" such that "compliance with the state statute would frustrate the purposes of the federal scheme," the state law must yield to the federal statute. *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 492 (S.D.N.Y. 2013) (internal quotations omitted). Because "the existence of preemption turns on Congress's intent, we are to begin, as we do in any exercise of statutory construction[,] with the text . . . and move on, as need be, to the structure and purposes of the Act." *McNally v. Port Auth. of N.Y. & N.J. (In re WTC Disaster Site)*, 414 F.3d 352, 371 (2d Cir. 2005) (alteration in original) (internal quotation marks omitted).

### B.    Congressional Intent in Passing the FHA

#### a.    The Text of the FHA

The FHA establishes that "it shall be unlawful – to refuse to sell or rent . . . , or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any

person because of race, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Congress enacted the FHA "to eradicate discriminatory practices within a sector of our Nation's economy." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2511 (2015); *see* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States"); *see also* H.R. Rep. No. 100-711, at 15, (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2176 (explaining that the FHA "provides a clear national policy against discrimination in housing"). The FHA penalizes actions that, in any way, "make unavailable" any dwelling to any person "because of race, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The results-oriented phrase "otherwise make unavailable" "signal[s] a shift in emphasis from an actor's intent to the consequences of his actions." *Tex. Dep't of Hous.*, 135 S. Ct. at 2519. In other words, the FHA was not designed simply to punish those who discriminate, but also to remove even unintentional barriers to the availability of housing.[6] Thus, one can violate the statute through discriminatory intent or merely disparate impact. *See id.* at 2523. Enforcing a state statute that compensates an FHA

---

[6] The FHA's text reveals that the availability of housing is central to § 3604(a) claims. *See, e.g., Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (en banc) ("Availability, not simply habitability, is the right that § 3604(a) protects."); *Cox v. City of Dallas*, 430 F.3d 734, 741 (5th Cir. 2005) ("[t]he simple language of § 3604(a) does not apply to current homeowners whose complaint is that the value or habitability of their houses has decreased because such a complaint is not about availability.") (internal quotation marks omitted); *Tenafly Eruv Ass'n v. Borough of Tenafly¸* 309 F.3d 144, 157 n.13 (3d Cir. 2002) (Orthodox Jewish plaintiffs who challenged the City's removal of religious objects from utility poles had not stated a § 3604(a) claim because they were current homeowners and removal only made their residency less desirable, not "unavailable."); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999) (no claim under § 3604(a) for the government's decision to locate a highway near a neighborhood because the claim of the plaintiffs, as current residents, "is too remotely related to the housing interests that are protected by the Fair Housing Act."); *Clifton Terrace Assocs. v. United Techs. Corp.*, 929 F.2d 714, 719 (D.C. Cir. 1991) ("By their plan terms [§ 3604(a),(f)(1)] reach only discrimination that adversely affects the availability of housing" rather than its "habitability."). Therefore, a state law that makes housing less available thwarts the purpose of the FHA as set out in its text.

violator would undermine Congress's purpose in achieving the result of the availability of fair housing.

Not only does the FHA include manifest results-oriented language, but it has no language suggesting that owners whose property loses value as a result of the statute are entitled to compensation. Congress surely envisioned that rectifying historical discrimination in housing might have a negative effect on property values in some instances, and it surely knew how to provide for remuneration for those losses if it thought that was fitting. Congress's omission of any such provision signals its belief that any diminution in property value was an appropriate price to pay for fair housing, and thus to allow such compensation pursuant to state law would contradict the statutory scheme.

The stated goal of the FHA is "regulatory rather than compensatory," *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 601-02 (4th Cir. 2010), and the statutory scheme is "preventive as well as remedial," *id.* at 601. In other words, the language and structure of the statute evidence Congress's intent to achieve the result of fair housing not only by remedying obstacles but also via deterrence. That goal – deterring even acts that unintentionally create disparate impact in housing – would be circumvented if violators could be compensated, at the victims' expense, for losses arising from the violation.

Congress's stated intent also limits what avenues are available to a party that violates the FHA. Because of the statute's broad language and Congress's intent to end discriminatory housing practices, state law procedures cannot be used to circumvent Congress's regulatory scheme. *See Picard v. JPMorgan Chase & Co.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 721 F.3d 54, 65 (2d Cir. 2013) (state law contribution claims are inapplicable for fines for violation of federal laws); *Niles Bolton*, 602 F.3d at 601-02 (allowing FHA violator to shift liability to

third party via state law indemnification claim would run counter to aims of FHA); *Equal Rights Ctr. v. Archstone Smith Tr.*, 603 F. Supp. 2d 814, 822 (D. Md. 2009) (claim for indemnity or contribution not allowed under FHA because "the unmistakable thrust of Supreme Court precedent is that Congress' selection (and non-selection) of remedies in comprehensive remedial federal statutes, especially anti-discrimination statutes, is not a proper subject with which federal or state courts ought to tinker"), *aff'd sub nom. Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597 (4th Cir. 2010); *KBL Corp. v. Arnouts*, 646 F. Supp. 2d 335, 341 (S.D.N.Y. 2009) (a "plaintiff cannot use New York State common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme"); *cf. Feltenstein v. City Sch. Dist. Of New Rochelle*, No. 14-CV-7484, 2015 WL 10097519, at *3 (S.D.N.Y. Dec. 18, 2015) ("[T]he [ADA] . . . remedial scheme . . . which does not include provisions for indemnification and contribution . . . would be frustrated by the availability of such remedies under state law, because it would contravene Congress' intent to hold accountable all who actually violate the terms of the statute.").  If the remedial scheme does not allow costs to be shifted to a co-violator, it surely does not allow them to be shifted to the victim.

The Sisters argue that the remedial scheme does allow shifting of costs and that the prohibition against contribution or indemnification should be limited to instances where complete indemnification is sought.  (D's Opp. at 18-21.)  But the cases on which the Sisters rely do not support their argument that the FHA preempts state law only where the state remedy seeks to re-allocate the full risk of loss.  (*Id.*)  In *City of Los Angeles v. AECOM Servs.*, 854 F.3d 1149, 1156 (9th Cir. 2017), the Ninth Circuit held that a state contribution claim by the City of Los Angeles against its contractor for failure to conform its projects to ADA standards was not preempted by the ADA because "the relevant contractual provisions assign liability . . . only to

the extent that their own actions give rise to liability." The court reasoned that the claim for contribution only sought to allocate the blame among the parties responsible for causing the breach, and therefore the state law claims did not conflict with the ADA, but actually furthered the purpose of the ADA. *Id.* at 1156-59. Given that state laws that do not stand as an obstacle to the accomplishment of the goals of Congress are not preempted, *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), this result is unsurprising. Here, however, the Sisters do not allege that if they are found to have violated the FHA, S&R would be partly at fault; therefore allocating or offsetting the damages they owe to S&R runs afoul of the principles laid out in *City of Los Angeles v. AECOM*, which plainly would have found a conflict had the city tried to lay off its liability on the disabled people or other innocent third parties.

Next, the Sisters also cite *Equal Rights Center v. Niles Bolton Associates* for the proposition that the "FHA does not preempt state law claims for contribution and negligence unless [the] claims at issue" seek full indemnification for any FHA violation. (D's Opp. at 19) (quoting 602 F.3d at 602). The Sisters' characterization ignores the Fourth Circuit's holding – that actions that serve to insulate a party from liability under the FHA are preempted when they conflict with the aims of the FHA. *See Niles Bolton*, 602 F.3d at 602; *see also Feltenstein*, 2015 WL 10097519, at *3 (state law indemnification and contribution claims are preempted by the ADA "because it would contravene Congress' intent to hold accountable all who actually violate the terms of the statute"). The Fourth Circuit explained that "[i]f a developer of apartment housing, who concededly has a non-delegable duty to comply with the ADA and FHA, can be indemnified under state law for its ADA and FHA violations, then the developer will not be accountable for discriminatory practices in building apartment housing." *Niles Bolton*, 602 F.3d at 602. This, the court said, is "antithetical to the purposes of the FHA and ADA." *Id.* Because

a housing developer's duty to comply with the FHA is non-delegable, the purposes of FHA are not served by allowing an indemnification claim by a developer against another party such as its architect. And even if the *Niles Bolton* court might have allowed a claim seeking partial contribution from another culpable party, there is no suggestion it would have allowed a state-law claim against a non-culpable party.

Lastly, the Sisters point to *Miami Valley Fair Housing Center v. Campus Village Wright State, LLC*, No. 10-CV-230, 2012 WL 4473236 (S.D. Ohio Sept. 26, 2012), for the proposition that the FHA does not preempt claims that arise from contractual duties outside the FHA itself. (D's Opp. at 19.) But the court in *Miami Valley*, citing *Niles Bolton*, held that the FHA does not allow for claims of indemnification and contribution. *Miami Valley Fair Hous. Ctr.*, 2012 WL 4473236, at *6 ("[I]f parties, . . . could insulate themselves from financial ramifications for violations of the FHA, what incentive would remain for any party – aside from perhaps an architect or architectural design firm – to ensure compliance with the FHA."). The same result applied to state law contract and negligence claims by the developer against its architectural firm, because those claims stemmed from the FHA violation and were therefore preempted. *Id.* at *10 ("[W]hat . . . Claimants really seek is to have C+R pay all claims that arise under the FHA violations, if any."). Nothing in *Miami Valley* – which does not allow a culpable party to shift its liability to another culpable party – suggests it would be acceptable for a culpable party to shift any part of its liability to an innocent party.

The dispositive analysis in these cases is not whether the state-law claim is based on "standards other than those imposed by the FHA," (D's Opp. at 20), but rather whether the allocation of economic liability among the parties serves the regulatory purposes of the FHA. *See Niles Bolton*, 602 F.3d at 602. "[T]he regulatory purposes of the ADA and FHA would be

undermined by allowing a claim" that would "diminish[] [the defendant's] incentive to ensure compliance with discrimination laws." *Id.* Because the Sisters would have a claim under RPAPL § 1951(2) only if their enforcement of the restrictive covenant were found to violate the FHA, the "regulatory purposes" and deterrent nature of the FHA would certainly be undermined if the Sisters could use state law as a means of compensation for that violation. And, to whatever extent contribution or indemnification were even allowed, it would only make sense in a case involving contribution from co-defendants or third parties responsible in part for the violation. In this case, however, there is no other wrongdoer or responsible party. Nothing in the cases cited by the Sisters suggests that the victims of discrimination can be forced to compensate the perpetrators. (D's Opp. at 19-21.)

In a separate argument, the Sisters contend that because the damages they allege in the counterclaim are based on the diminution in value of their property, as opposed to the damages S&R might recover in the FHA action, the indemnification cases are inapposite and their claim should not be deemed preempted. (*Id.* at 13-14, 19-21.) Even though the Sisters' RPAPL § 1951(2) recovery would be based on loss of property value rather than damages awarded to S&R, allowing such recovery would still prevent S&R from being made whole and would compensate the Sisters for the loss of a property "right" that is not legitimate because it violates federal law. The Sisters "are clearly not among the class which the statute is intended to protect, but rather are the parties whose conduct the statute was intended to regulate." *United States v. Quality Built Constr. Inc.*, 309 F. Supp. 2d 767, 778 (E.D.N.C. 2003). Because any right to recovery under RPAPL § 1951 would arise only if the Sisters themselves violate the FHA, such claims must be preempted. Any other result would undermine the regulatory and deterrent nature of the FHA.

b.     <u>Statutory Construction</u>

Courts have consistently held that the FHA should be construed broadly.  *See Shapiro v. Cadman Tower, Inc.*, 51 F.3d 328, 335 (2d Cir. 1995) ("[T]he Fair Housing Act [must] be given a generous construction, based on the importance of the anti-discrimination policies that it vindicates.") (internal quotation marks omitted); *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 87 (2d Cir. 2000) ("The Supreme Court has repeatedly directed the courts to give a generous construction to the Fair Housing Act.") (internal quotation marks omitted), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 212 (1972) ("We can give vitality to [42 U.S.C. § 3610(a)] only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute.").  The FHA is "a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority."  *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 417 (1968).

Courts have read the statute as part of a network of civil rights statutes that includes Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967, *Tex. Dep't of Hous.*, 135 S. Ct. at 2516-19.  Therefore, many of the expansive legal principles that apply to other civil rights statutes apply to the FHA as well.  *Id.*; *see Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n. 4 (2d Cir. 2003) ("Due to the similarities between the [ADA and the FHA], we interpret them in tandem."), *superseded on other grounds by regulation as stated in Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016).  For example, as with disparate impact claims under Title VII, claims that only allege a discriminatory effect on a subject class (as opposed to claims of discriminatory intent) are

cognizable under the FHA, because any act that "adversely affect[s] [the] status" of a person seeking housing is proscribed by the FHA. *Tex. Dep't of Hous.*, 135 S. Ct at 2518. Moreover, standing pursuant to the FHA is as broad as Article III will allow, thus ensuring the maximum enforcement of the Act. *See Trafficante*, 409 U.S. at 209 (even those who have not been denied housing as a result of discrimination have cognizable claim under FHA, as they act as "private attorneys general" to enforce the objectives of the Act); *Olsen v. Stark Homes Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (FHA definition of "aggrieved person" extends "as broadly as is permitted by Article III of the Constitution") (quoting *Trafficante*, 409 U.S. at 209).

The courts' consistent reading that Congress intended a broad construction of the statute further weighs against allowing competing state law claims to compensate violators of the FHA. To rule otherwise "would create a sinkhole that would swallow the general rule and cripple the effectiveness of the FHA. To say that private agreements under a state's . . . statute are capable of trumping federal anti-discrimination law verges on the ridiculous." *Astralis Condo. Ass'n v. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 70 (1st Cir. 2010) (local condominium law cannot be used as defense for not providing reasonable accommodation to handicapped tenant under FHA).

### c. Legislative History

The FHA's legislative history further illuminates congressional intent. The FHA sought "to eliminate the discriminatory business practices which might prevent a person economically able to do so from purchasing a house." *Dunn v. Midwestern Indem., Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1109 (S.D. Ohio 1979) (quoting H.R. 3504, 95th Cong. 1st Sess. (1977)). If Congress passed the FHA to ensure that protected persons who could afford a particular home were able to buy it, it surely intended that those persons would not have to pay extra – in the

form of compensation to the seller for the loss of the ability to enforce a violative covenant – for enforcing their rights to do so.

Additionally, if Congress viewed the diminution of property value a consequence requiring mitigation of loss, that story would be told in the FHA's legislative history. Instead, "[t]he Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (emphasis in original). "Behind the Act lay the widespread practice of refusing to sell or rent homes in desirable residential areas to members of minority groups." *Id.*; 114 Cong. Rec. 2279-80 (statement of Sen. Brooke) ("There are those who raise the specter of economic loss if fair housing laws open white communities to [black] families . . . . If there is any truth to this myth at all, it is rooted in the unequal access which [blacks] have had to housing . . . ."). The FHA's legislative history, and its singular focus on access, militates against allowing compensation under state law to those who impede access, even if their property loses value.

## C. RPAPL § 1951(2) is Preempted by the FHA

Taken together, the plain text, judicial construction, and legislative history of the FHA favor an expansive view of the statute. Actions that serve to decrease the availability of housing to protected persons, or in effect tax them for access, are proscribed by the FHA. *See Tex. Dep't of Hous.*, 135 S. Ct. at 2518 ("Congress' use of the phrase 'otherwise make unavailable' refers to the consequences of an action," and thus bans actions that cause discrimination in housing). Therefore, it follows that when adherence to a state law would make acquiring housing more difficult for a protected class, that law stands as an obstacle to accomplishing the full goals of Congress, and must be preempted. Such is the case here.

The Sisters contend that the aim of their counterclaim is "to even the playing field and allow for the Sisters to recoup the value of their loss in the event that their enforcement [of the covenant] . . . is deemed a violation of the Fair Housing Act." (ACC ¶ 16.) If successful, it would essentially allow the Sisters to impose money damages on S&R for its success on an FHA claim, and therefore make it more difficult for S&R to develop housing. The plain text, statutory construction, and legislative history of the FHA require that its enforcement be results-oriented, *see Tex. Dep't of Hous.*, 135 S. Ct. at 2519, and allowing compensation to the violator from the victim pursuant to state law would erode the deterrent effect of the FHA. If enforcing a restrictive covenant violates the results-oriented directive of the FHA, it follows that compensating a party for its inability to enforce that restrictive covenant is improper. Just as defendants are precluded from shifting liability for damages under the FHA pursuant to state indemnification law, *see Niles Bolton*, 602 F.3d at 602, a counterclaim that aims to shift or otherwise reduce liability by compensating the violator conflicts with the FHA's deterrent design, and is therefore preempted.

Finally, even though property law is an area occupied "by the historic police powers of the state," *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485 (1996), the relief that the Sisters request conflicts with Congress's "manifest purpose" in passing the FHA, and as a result any presumption against preemption is overcome, *Wyeth*, 555 U.S. at 565 (internal quotation marks omitted); *see New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam). This conclusion is supported by holdings concerning other federal civil rights statutes. *See, e.g., Howlett v. Rose*, 496 U.S. 356, 375 (1990) (state law sovereign immunity statutes cannot insulate state employees from claims arising under 42 U.S.C. § 1983 because "[t]he elements of, and the defenses to, a federal cause of action are defined by federal

law"). Allowing a state law to undermine a federal civil rights claim would "transmute a basic guarantee into an illusory promise; and the Supremacy Clause of the Constitution insures that the proper construction may be enforced." *Id.* at 376 (internal quotation marks omitted).

Thus, the Sisters' claim under RPAPL § 1951(2) is preempted by the FHA and is therefore dismissed.[7] I emphasize that no violation on the Sisters' part has been established at this point. I find only that if one were to be established, the Sisters would not be entitled to seek compensation under RPAPL § 1951(2).

## IV.    LEAVE TO AMEND

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Oneida Indian Nation of*

---

[7] The Sisters also argue that any relief granted under the FHA in this case, absent the enforcement of RPAPL § 1951(2), would constitute a taking under the Takings Clause of the Fifth Amendment. (D's Opp. at 18.) This theory is without merit. As S&R correctly notes, (Doc. 144 at 2), the Takings Clause does not operate against private individuals like the Plaintiff. *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 307 F. Supp. 2d 565, 585 (S.D.N.Y. 2004) ("It is beyond cavil that governmental action is required to trigger the application of this clause; it does not apply to private parties who are not state or governmental actors."), *aff'd*, 396 F.3d 178 (2d Cir. 2005). Further, a taking exists where property is physically invaded, its owner is deprived of all economically beneficial use, or a regulation has a significant economic impact and interferes with legitimate economic expectations or property interests – that is, in circumstances "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from its domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). The Sisters do not plausibly allege that if their enforcement of the covenant is deemed to violate the FHA, they will have been deprived of any legitimate property interest to the extent necessary to amount to a taking.

*N.Y. v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003), *rev'd on other grounds*, 544 U.S. 197 (2005).

The Sisters have already amended once, (*see* Doc. 139), after the benefit of a pre-motion letter and conference at which S&R's grounds for dismissal were discussed. (Minute Entry dated Nov. 15, 2017). Because there is no way for the Sisters to reformulate the ACC in a way that is not preempted, any attempt at re-pleading would be futile. *See, e.g., Oneida Indian Nation of N.Y.*, 337 F.3d at 168-69 (denying leave to amend because defendant's proposed defenses would not survive a motion to dismiss pursuant to Rule 12(b)(6)); *Myrieckes v. Woods*, No. 08-CV-4297, 2009 WL 884561 at *7 (S.D.N.Y. Mar. 31, 2009) (denying leave to amend because re-pleading a preempted claim is futile). Further, the Sisters have not sought leave to amend or otherwise suggested that they have facts that would remedy the deficiencies in their pleading. Therefore I decline to grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014) (denying leave to amend was proper where plaintiff had already failed to cure pleading deficiencies and did not specify what new facts it had that would cure those deficiencies) (collecting cases); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not granting leave to amend where plaintiff had already amended complaint once and amendment would have been futile).

## V.   **CONCLUSION**

For the reasons stated above, Counterclaim Defendant's motion to dismiss is GRANTED.

The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 140).

**SO ORDERED.**

Dated: August 29, 2018
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.